Allen M. Gardner (Utah Bar #7530)
Peter C. Schofield (Utah Bar #9447)
Christopher Sanders (Utah Bar #16939)
**KIRTON MCCONKIE**
Thanksgiving Park Four
2600 West Executive Parkway, Suite 400
Lehi, Utah 84043
Telephone: (801) 426-2100
Facsimile: (801) 426-2101
agardner@kmclaw.com
pschofield@kmclaw.com
csanders@kmclaw.com

Philip J. Perry (*pro hac vice* forthcoming)
Andrew D. Prins (*pro hac vice* forthcoming)
Abid R. Qureshi (*pro hac vice* forthcoming)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
philip.perry@lw.com
andrew.prins@lw.com
abid.qureshi@lw.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, <br><br> *Plaintiff*, <br><br> v. <br><br> **JON PIKE**, **in his official capacity as Commissioner of the Utah Insurance Department and DEREK BROWN, in his official capacity as Attorney General of Utah,** <br><br> *Defendants*. | **PLAINTIFF'S *AMENDED* MOTION FOR PRELIMINARY INJUNCTIVE RELIEF** <br><br> **No. 2:25-cv-00308** <br><br> **Judge: Hon. Dale A. Kimball** <br><br><br> **HEARING REQUESTED** |

i

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

      A.     The Federal 340B Drug Pricing Program ................................................... 4

             1.     Congress Established 340B's Structure And Purpose ................................. 4

             2.     Contract Pharmacies Barge Into 340B ..................................................... 6

             3.     Manufacturers Attempt To Curb Abuse ................................................... 9

      B.     Utah Senate Bill 69 ................................................................................. 11

ARGUMENT .................................................................................................................... 12

I.     PhRMA Is Likely To Succeed On The Merits ................................................. 12

      A.     S.B. 69 Conflicts With The Federal Regime Created By Congress ...................... 12

      B.     S.B. 69 Intrudes On The Exclusively Federal Field Of 340B's Operation ............ 20

II.     The Remaining Factors Favor An Injunction ................................................... 23

CONCLUSION .................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Arizona v. United States*,
 567 U.S. 387 (2012)........................................................................................19, 21, 23

*AstraZeneca Pharms. LP v. Becerra*,
 543 F. Supp. 3d 47 (D. Del. 2021)..................................................................................21

*Buckman v. Plaintiffs' Legal Comm.*,
 531 U.S. 341 (2001)........................................................................................17, 20, 21

*Chamber of Com. of U.S. v. Edmondson*,
 594 F.3d 742 (10th Cir. 2010) ..............................................................................24, 25

*City of Burbank v. Lockheed Air Terminal Inc.*,
 411 U.S. 624 (1973)....................................................................................................20

*Cloud Peak Energy Inc. v. United States Dep't of Interior*,
 415 F. Supp. 3d 1034 (D. Wyo. 2019).............................................................................24

*Core Progression Franchise LLC v. O'Hare*,
 No. 21-cv-0643, 2021 WL 1222768 (D. Colo. Apr. 1, 2021), .................................................25

*Crosby v. Nat'l Foreign Trade Council*,
 530 U.S. 363 (2000)....................................................................................................12

*Forest Park II v. Hadley*,
 336 F.3d 724 (8th Cir. 2003) .........................................................................................15

*Free Speech Coal. v. Gonzales*,
 406 F. Supp. 2d 1196 (D. Colo. 2005)..............................................................................24

*Geier v. Am. Honda Motor Co.*,
 529 U.S. 861 (2000)....................................................................................................12

*Gobeille v. Liberty Mut. Ins. Co.*,
 577 U.S. 312 (2016)....................................................................................................15

*Int'l Paper Co. v. Ouellette*,
 479 U.S. 481 (1987)....................................................................................................13

*Lee v. Bickell*,
 292 U.S. 415 (1934)....................................................................................................23

i

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992)..................................................................................................23

*NetChoice, LLC v. Reyes*,
  748 F. Supp. 3d 1105 (D. Utah 2024)......................................................................24

*Nken v. Holder*,
  556 U.S. 418 (2009)..................................................................................................12

*NLRB v. Nash-Finch Co.*,
  404 U.S. 138 (1971)..................................................................................................21

*Novartis Pharms. Corp. v. Johnson*,
  102 F.4th 452 (D.C. Cir. 2024).......................................................................... *passim*

*PhRMA v. Morrisey*,
  No. 24-cv-00271, 2024 WL 5147643 (S.D. W. Va. Dec. 17, 2024) .............................. *passim*

*San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*,
  359 U.S. 236 (1959)..................................................................................................20

*Sanofi Aventis U.S. LLC v. HHS*,
  58 F.4th 696 (3d Cir. 2023) .............................................................................. *passim*

*Schmeisser GmbH v. AC-Unity d.o.*
  *o*, No. 21-CV-24-SWS, 2021 WL 7286256 (D. Wyo. Mar. 19, 2021)...................................25

*Schrier v. Univ. of Colo.*,
  427 F.3d 1253 (10th Cir. 2005) ...............................................................................25

*Seneca-Cayuga Tribe of Okla. v. State of Okla. ex rel. Thompson*,
  874 F.2d 709 (10th Cir. 1989) ...............................................................................25

*Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*,
  805 F.2d 351 (10th Cir. 1986) ...............................................................................23

*United Therapeutics Corp. v. Johnson*,
  No. 21-5304 (D.C. Cir. Jan. 20, 2023)....................................................................22

*Villas at Parkside Partners v. City of Farmers Branch*,
  726 F.3d 524 (5th Cir. 2013) ...............................................................................15

*Wis. Dep't of Indus., Labor & Human Rels. v. Gould Inc.*,
  475 U.S. 282 (1986)....................................................................................19, 20, 23

ii

# STATUTES

42 U.S.C.
§ 256b ....................................................................................................................... *passim*
§ 256b(a)(1) .............................................................................................................1, 2, 5
§ 256b(a)(4) ...............................................................................................................5, 21
§ 256b(a)(5) .............................................................................................................16, 21
§ 256b(d) .................................................................................................................18, 21
§ 256b(d)(1) .......................................................................................................5, 18, 20
§ 256b(d)(3) ...................................................................................................................16
§ 1320f-3(a) ..................................................................................................................17

Utah Code
§ 31A-46-102(1) ...................................................................................................3, 11, 22
§ 31A-46-311(2)(b)..............................................................................................11, 15
§ 31A-46-311(2) (a), (b) ...................................................................................................3

# TREATISES

2 Williston on Contracts § 6:11 (4th ed.).................................................................................14

# RULES AND REGULATIONS

42 C.F.R. § 1003.1500(a).........................................................................................................5

61 Fed. Reg.
43,550...................................................................................................................6, 8
43,555.......................................................................................................................6
65,409.....................................................................................................................16

75 Fed. Reg.
10,273.......................................................................................................................6
10,277-78 .................................................................................................................9

89 Fed. Reg.
28,644.....................................................................................................................16
28,649.................................................................................................................18, 21

# CONSTITUTIONAL PROVISIONS

U.S. Constitution, Article VI, cl. 2 .......................................................................................1, 12

# OTHER AUTHORITIES

Adam J. Fein, *The 340B Program Reached $54 Billion in 2022-Up 22% vs. 2021*,
Drug Channels (Sept. 24, 2023), https://tinyurl.com/44yz9b3d ...............................................9

CMS, Medicare Drug Price Negotiation Program Draft Guidance (May 3, 2024), https://tinyurl.com/dapyyjyf........................................................................................17

CMS, Medicare Drug Pricing Negotiation Final Guidance (Oct. 2, 2024), https://tinyurl.com/3sx8hmah; .................................................................................17

CVS, SEC Form 10-K (2024), https://tinyurl.com/4pbtt9x8;....................................7

Dallas Cnty. 340B Contract – ReCept Pharmacy, https://tinyurl.com/4wm5d9fd;.........................8

*Examining Oversight Reports on the 340B Drug Pricing Program*, 115th Cong. (2018) (statement of Ann Maxwell, Assistant Inspector Gen., OIG), https://tinyurl.com/3bx8dk42 .................................................................................7

GAO, GAO-18-480, Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement (2018), https://tinyurl.com/mr4xbp2m ("2018 GAO Report") ..............................................7

GAO, GAO-11-836, *Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* (2011), https://tinyurl.com/yc2mhbeu; 2018 .....................................................................7, 8

Gov. Cox, *Mar. 27, 2025 Letter to Utah Legislature*, https://tinyurl.com/39d555v5...........................................................................4

H.R. Rep. No. 102-384, pt. 2 (1992)........................................................................4

Intermountain Health, *Comments on Proposed Changes to the 340B Administrative Dispute Resolution* (Docket No. HRSA-2021-000X), https://tinyurl.com/ykhsuh5v .................................................................................18

Minn. Dep't of Health, 340B *Covered Entity Report* (Nov. 25, 2024), https://tinyurl.com/5v69tbft .........................................................................7

Monterey Cnty. and CVS Pharmacy Contract, Inc., https://tinyurl.com/yr72mhup......................8

S. Bus. & Labor Comm. Hr'g Feb. 28, 2025, https://tinyurl.com/yc8rdm3j ................................3

U.S. Senate Comm. on Health Education Labor & Pensions, *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program* (Apr. 2025), https://tinyurl.com/3rh429c9................................................................................8

Utah S. Bus. & Labor Comm. Hr'g Feb. 13, 2025, https://tinyurl.com/yh3jj5x5; .........................3

Walgreens, SEC Form 10-K (2024), https://tinyurl.com/zp9vv465 ...............................................7

iv

**INTRODUCTION**

Utah Senate Bill 69 (the "Act" or "S.B. 69") attempts to regulate the operation of a federal drug pricing program and is preempted under the Supremacy Clause of the U.S. Constitution.

The federal 340B Drug Pricing Program, 42 U.S.C. § 256b ("340B"), is a unique form of a privately-funded federal subsidy. It requires that drug manufacturers make an "offer" to sell certain drugs to 15 statutorily enumerated types of healthcare providers, known as "covered entities," at "strikingly generous" prices, often "penn[ies] per unit." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456 (D.C. Cir. 2024). Congress could not have outright mandated these deeply reduced-price sales—doing so would invite constitutional challenge. Instead, Congress struck a specific bargain with manufacturers: If manufacturers agree to "offer" certain drugs at 340B prices to covered entities, those drugs will also be eligible for reimbursement under Medicare Part B and the federal share of Medicaid. Otherwise, drug manufacturers' products are not eligible for reimbursement under those other critical federal programs. As the U.S. Supreme Court made clear in *Astra USA, Inc. v. Santa Clara County*, the 340B program is inextricably bound to these other federal programs. 563 U.S. 110, 120 (2011). Congress intended that the federal agency running 340B—the U.S. Department of Health and Human Services ("HHS")—would "hold the control rein," to ensure these federal programs would be administered "harmoniously and on a uniform, nationwide basis." *Id.*

What specific terms are required in a drug manufacturer's federal "offer" to sell its drugs at deeply reduced 340B prices—that is, what requirements are imposed as a condition of participation in federal healthcare programs—is a question of federal law requiring construction of 42 U.S.C. 256b(a)(1). Multiple federal courts have already resolved this question: a drug manufacturer that includes within its 340B offer a set of reasonable conditions, including reasonable conditions as to drug delivery, has complied with its obligations under the federal

statute.  *Novartis*, 102 F.4th at 460-64; *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703 (3d Cir. 2023).  These specific, permissible reasonable conditions define the scope of a drug manufacturer's federal obligation to sell and deliver 340B priced drugs.

Utah's S.B. 69 attempts to change the requirements of the federal 340B program by explicitly outlawing the two conditions that federal courts have found to be reasonable and compliant with 42 U.S.C. § 256b(a)(1), and by imposing Utah's own state law enforcement process for compelling drug sales at the federal 340B price.  Under S.B. 69, the State can apply both civil and criminal penalties.  *See infra* at 12.  These state penalties punish lawful actions under the federal 340B program and are directly at odds with Congress's detailed regime for addressing disputes about the operation of that program.  *PhRMA v. Morrisey*, No. 24-cv-00271, 2024 WL 5147643 (S.D. W. Va. Dec. 17, 2024) (holding that a similar law to S.B. 69 was preempted by 340B).

There is no genuine dispute what Utah is actually attempting to accomplish with S.B. 69: the drugs at issue are already available in Utah at commercial or negotiated prices and will remain so whether S.B. 69 is permitted to go into effect.  So S.B. 69 is not attempting to ensure drug access.  Its only goal is to force more sales at the reduced 340B price than are required under federal law. *See Morrisey*, 2024 WL 5147643, at *8 (concluding state statute was about pricing, not delivery).  Worse, it is only about pricing for 340B covered entities and their for-profit pharmacy and consultant intermediaries, who are not obligated under the federal statute to share the steep 340B price reductions with patients.  Indeed, most patients receive no drug price reductions on drugs purchased at the 340B price:  the financial benefit of those 340B prices goes almost entirely to the covered entities and the pharmacies who contract with them.  *See Novartis*, 102 F.4th at 457 ("The covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate.").

2

Multiple federal watchdogs and a recent U.S. Senate Committee Report have documented abuses of the 340B program related to use of contract pharmacies. *See infra* at 6-8.

The plain text of S.B. 69 demonstrates exactly what Utah is attempting here. S.B. 69 prevents manufacturers from "directly or indirectly restrict[ing] or prohibit[ing]" the "acquisition, dispensing, or delivery of a 340B drug to any location authorized by a 340B entity to receive the drug" or from requiring submission of "any claim data, utilization data, or information about a 340B's contracts with a third-party." Utah Code § 31A-46-311(2)(a), (b); *id.* § 31A-46-102(1) (defining 340B drug with reference to 340B); *see Novartis*, 102 F.4th at 463-64 (finding the same actions S.B. 69 now seeks to prohibit appropriate and compliant with federal law governing this federal program). Indeed, many Utah legislators, including Senators on the Business and Labor Committee which declined twice to favorably recommend S.B. 69 out of Committee, recognized that Utah would be wading into the midst of a federal program and would be increasing the scope of what is required from manufacturers under 340B. As one Utah Senator put it: "I'm trying to convince myself to get into the middle of a federal program." Utah S. Bus. & Labor Comm. Hr'g Feb. 13, 2025 at 59:19-27, https://tinyurl.com/yh3jj5x5; *id.* at 9:47-43, 8:09-7:56 (second Utah Senator describing S.B. 69 as "expanding a federal program" and stating he was "not sure that we jump in the middle of this right now when we're looking at a federal program that has potentially gone beyond its original intent and if this is the best way to help solve that"); S. Bus. & Labor Comm. Hr'g Feb. 28, 2025 at 47:20-16, 46:28-12 (another Utah Senator noting that "he didn't create the program"), https://tinyurl.com/yc8rdm3j. Governor Cox echoed these thoughts when allowing S.B. 69 to go into effect without his signature, noting that the bill "would require pharmaceutical manufacturers to extend federal 340B discounts to for-profit contract pharmacies" without "requir[ing] cost savings to be passed onto patients" or being "transparent in how cost savings are used." Gov. Cox, *Mar. 27, 2025 Letter to Utah Legislature* 5,

https://tinyurl.com/39d555v5. In his view, 340B "was established by Congress," and it should be addressed "at the federal level." *Id.*

Absent preliminary injunctive relief, drug manufacturer members of Plaintiff Pharmaceutical Research and Manufacturers of America ("PhRMA") will be irreparably harmed—*including by* being compelled on threat of criminal penalties to give away drugs at prices as low as a penny per unit in circumstances where federal law does not require it. PhRMA respectfully requests the Court grant its motion for a preliminary injunction and enjoin enforcement of S.B. 69 against its members and as to their drugs during this litigation.

## BACKGROUND

### A. The Federal 340B Drug Pricing Program

#### 1. Congress Established 340B's Structure and Purpose

Generally, drug manufacturers must participate in 340B to have certain of their drugs reimbursed under Medicare Part B and the federal portion of Medicaid. At the outset, Congress intended 340B's scope to be small, which kept 340B's incentive structure balanced. H.R. Rep. No. 102-384, pt. 2, at 13 (1992) (anticipating that only 90 hospitals, and a range of clinics and health centers would participate.)

340B is purely a creature of federal law that sets requirements for when manufacturers are required to offer their drugs at federally reduced prices. The statute's comprehensive nature is evident from its text and structure. The statute first defines the federal obligation on drug manufacturers. It provides that manufacturers must "enter into an agreement" with the HHS Secretary (the "Pharmaceutical Pricing Agreement" ("PPA")), and that such an agreement "shall require that the manufacturer offer each covered entity covered outpatient drugs for purchase" at or below a ceiling price. 42 U.S.C. § 256b(a)(1); *see also Novartis*, 102 F.4th at 462 (explaining that 340B "require[s] drug manufacturers to make an 'offer'" to covered entities); *Sanofi*, 58 F.4th

4

at 703 (discussing the "shall offer" provision).  The "offer" must be "bona fide," by providing reasonable terms for delivery, consistent with the statute.  *Novartis*, 102 F.4th at 463-64.

The statute next defines and expressly limits which specific entities are entitled to access 340B pricing: fifteen types of healthcare providers.  42 U.S.C. § 256b(a)(4).  Even if they fall within one of those categories, covered entities can lose their eligibility if they engage in "diversion"—selling or transferring the drugs to anyone other than their patients—or duplicate discounting—seeking a rebate under Medicaid for a 340B-priced drug.  *Id.* § 256b(a)(2), (5).

In 2010, Congress amended 340B to address questions about enforcement of 340B pricing obligations and disputes between drug manufacturers and covered entities.  As the Supreme Court explained in *Astra*, Congress created an entirely federal scheme for enforcement as the "proper remedy."  563 U.S. at 120-22.  In 42 U.S.C. § 256b(d)(1)(B)(vi), Congress instructed HHS to create a system of enforcement, including monetary sanctions on a manufacturer who "knowingly and intentionally" charge a covered entity more than the 340B price.  Before imposing sanctions, HHS must serve written notice, 42 C.F.R. § 1003.1500(a), and provide advance warnings, *see* 42 U.S.C. §256b(d)(1)(B)(ii) (requiring HHS to establish procedures to resolve disputes amicably, including through dialogue with the agency).  Congress also created a special process known as administrative dispute resolution ("ADR") to address disputes between manufacturers and covered entities.  *Id.* §256b(d)(3).  The United States has described that scheme as the "exclusive remedy" for such disputes to the Supreme Court.  *See infra* at 22.  Covered entities have invoked the federal ADR process on multiple occasions and have claimed that it addresses exactly the type of contract pharmacy issues S.B. 69 addresses.[1]

---

[1] Pet. ¶ 1, *Open Door Cmty. Health Ctrs. v. AstraZeneca Pharms., LP* (HHS ADR Bd. Jan. 13, 2021), https://tinyurl.com/2twhwhtc (Covered entities asked the panel "to order [the manufacturer] to resume offering covered outpatient drugs at the 340B ceiling price to Petitioner through its

2.    Contract Pharmacies Barge Into 340B

In 1994 and 1996, the U.S. Health Resources and Services Administration ("HRSA"), a subcomponent agency of HHS, issued guidance allowing certain covered entities (those without their own in-house pharmacies to dispense 340B-priced drugs) to identify one "contract pharmacy" to receive and dispense 340B-priced drugs to patients of the covered entity. *See* 61 Fed. Reg. 43,549, 43,550, 43,555 (Aug. 23, 1996). HRSA's guidance also provided criteria for the contractual arrangement, which included pharmacy verification, at the time of dispensing for every 340B prescription, that the patient had been treated at the covered entity. *Id.* at 43,555. The one-contract-pharmacy limit practically ensured that a covered entity would choose a nearby pharmacy (or contract with a third-party pharmacy to operate within its facility), set prices for the drugs dispensed there, and closely supervise the process—with the pharmacy acting as the equivalent of an in-house pharmacy. *Id.* at 43,551, 43,553-54.

In 2010, HRSA, in guidance, lifted its one-pharmacy limit. 75 Fed. Reg. 10,272, 10,273 (Mar. 5, 2010). As the Government Accountability Office ("GAO") and the HHS Inspector General ("OIG") explained, this opened the floodgates: Even though Congress did not authorize them to participate in 340B, many sophisticated for-profit pharmacies—including the Nation's largest chains—recognized that if they could insert themselves into 340B, they could sell 340B-priced drugs at or near full price and pocket a portion as profit for themselves, by receiving either a percentage of the sales price or a flat fee per prescription. *Novartis*, 102 F.4th at 456-58; *see also* Minn. Dep't of Health, *340B Covered Entity Report* 9 (Nov. 25, 2024), https://tinyurl.com/5v69tbft (finding approximately $1 out of $6 dollars of gross revenue from

---

contract pharmacies."); *see also* Pet. ¶¶ 35-37, *Univ. of Wash. Med. Ctr. v. AstraZeneca Pharms. LP* (ADR Bd. Sept. 29, 2023), Schofield Decl., Ex. 4-A (other covered entities asserting similar).

340B went to contract pharmacies and third-party administrators).[2]

Predictably, the number of for-profit pharmacies participating in 340B greatly increased. According to GAO, between 2010 and 2018 the number of contract pharmacy arrangements increased "more than fifteen-fold, from about 1,300 to approximately 20,000." GAO, GAO-18-480, Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement 10 (2018), https://tinyurl.com/mr4xbp2m ("2018 GAO Report"). Some covered entities use *hundreds* of contract pharmacies, 2018 GAO Report at 18 (explaining one entity used 439 contract pharmacies), including in states thousands of miles from their facilities.

This explosion of contract pharmacies ballooned the size of 340B and increased the risk of abuse. When covered entities' in-house pharmacies dispense 340B-priced drugs, they are almost guaranteed to dispense drugs to their patients. Not so with contract pharmacies, which serve both covered entities' patients and other consumers. *Examining Oversight Reports on the 340B Drug Pricing Program*, 115th Cong. 11 (2018) (statement of Ann Maxwell, Assistant Inspector Gen., OIG), https://tinyurl.com/3bx8dk42 ("Maxwell"). In a GAO study, contract pharmacies accounted for nearly two-thirds of the violations for unlawful diversion of 340B-priced drugs uncovered by HRSA. GAO, GAO-11-836, Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement 27-28 (2011), https://tinyurl.com/yc2mhbeu; 2018 GAO Report at 44 ("The identified noncompliance at contract pharmacies raises questions about the effectiveness of covered entities' current oversight practices."); *id.* at 45 ("The expansion of contract pharmacies . . . increases potential risks to the 340B Program, such as risks related to diversion and duplicate discounts."). A recent staff report from the U.S. Senate Committee on

---

[2] Both CVS and Walgreens have publicly disclosed that 340B profits are material to their finances and that a reduction in contract pharmacy arrangements "could materially and adversely affect" their finances. CVS, SEC Form 10-K 23 (2024), https://tinyurl.com/4pbtt9x8; Walgreens, SEC Form 10-K 30 (2024), https://tinyurl.com/zp9vv465.

Health Education Labor & Pensions reiterated these issues, finding that the "growth in the use of contract pharmacies has amplified the complexity of 340B Program oversight, particularly regarding patient eligibility, drug diversion, and duplicate discounts." *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program* 3 (Apr. 2025), https://tinyurl.com/3rh429c9.

The opportunity for abuse in this 340B arbitrage scheme is even more acute given most contract pharmacies' use of the product "replenishment model." *Id.* at 31 (recognizing that "most covered entities now use the virtual inventory/product replenishment model"). Although HRSA has directed, in light of the prohibitions on diversion and duplicate discounting, that covered entities should retain title to 340B drugs and allow contract pharmacies to have 340B-priced drugs only if they operate as an agent of the covered entity for dispensing, 61 Fed. Reg. at 43,550, 43,553, the product replenishment model jettisons these limitations.[3] Using this model, contract pharmacies dispense drugs from their general inventories to all customers (covered entity patient or not). Maxwell at 11-12. On the back end, contract pharmacies use undisclosed algorithms to retroactively identify customers that may have some relationship to a covered entity. *Id.* at 11; 2018 GAO Report at 2. Contract pharmacies then restock their general inventories with 340B-priced drugs based on the algorithms' outcome. Pedley Decl. ¶¶ 5-11, *Sanofi-Aventis U.S., LLC v. HHS*, No. 21-cv-634 (D.N.J. June 24, 2021), ECF No. 93-2.

Because drugs come out of a general inventory, the question is not whether the pharmacy will get the drug, it is only what price the pharmacy and covered entity will pay when the pharmacy replenishes its inventory. *Morrisey*, 2024 WL 5147643, at *8. As the *Morrisey* court explained, "[b]ecause the drug is already in the hands of the contract pharmacy even before the patient arrives

---

[3] *See, e.g.*, Walgreens Contract §§ 3.3.5, 8.10, *Sanofi-Aventis U.S. LLC v. HHS*, No. 24-cv-1603 (D.D.C. Nov. 29, 2024), ECF No. 24-2 (showing contract pharmacies take title and do not operate as agents); Dallas Cnty. 340B Contract – ReCept Pharmacy 5, https://tinyurl.com/4wm5d9fd; Monterey Cnty. and CVS Pharmacy Contract, Inc. 9, https://tinyurl.com/yr72mhup.

at the pharmacy, the question is not about delivery of the drug.  The question is only about what price the pharmacy and the covered entity will pay the manufacturer for the replenished drug upon distribution of the 340B Program eligible one.  Put another way, the system is about delivery *at a given price*, not delivery *per se*."  *Id.*

The product replenishment model's black-box system—which does not require verification of covered-entity patient status at dispensing—creates more opportunities for illegal diversion.  Maxwell at 11-12; 75 Fed. Reg. at 10,277-78.  It also results in greater profits for pharmacies and covered entities, creating an incentive to use more pharmacies and "catalog as many prescriptions as possible."  *Novartis*, 102 F.4th at 457-58.  And because 340B pricing is not applied until after patients depart, most 340B price reductions are not shared with patients.  *Id.* at 457.  Given these developments, 340B has ballooned.  With the list price value (i.e., based on wholesale acquisition cost) of 340B purchases rising to $124.1 billion in 2023 alone, *id.*, 340B is now the second largest government pharmaceutical program, exceeded only by Medicare Part D.[4]

3.    Manufacturers Attempt to Curb Abuse

Faced with the increased risk of abuse, many manufacturers individually adopted policies on contract pharmacy use.  The policies differ but each permits covered entities to purchase an unlimited number of 340B-priced drugs for delivery to the covered entity, while placing reasonable conditions when manufacturers will provide delivery of 340B-priced drugs to contract pharmacies.  *Sanofi*, 58 F.4th at 701; *Novartis*, 102 F.4th at 458, 463-64.  For example, to detect diversion and duplicate discounting, PhRMA member declarants require claims data where contract pharmacies are involved. *See* Declaration of Justin McCarthy, attached hereto as Exhibit 3, ¶ 11 (hereinafter,

---

[4] Adam J. Fein, *The 340B Program Reached $54 Billion in 2022—Up 22% vs. 2021*, Drug Channels (Sept. 24, 2023), https://tinyurl.com/44yz9b3d.

"Exh. 3, McCarthy Decl."); *see also* Declaration of Patrick Costello, attached hereto as Exhibit 2, ¶ 13 (hereinafter, "Exh. 2, Costello Decl.").

In May 2021, HRSA issued violation determinations to manufacturers who had implemented these policies. *See Novartis*, 2021 WL 5161783, at \*5. Multiple manufacturers—including several PhRMA members—sued HHS and HRSA in federal courts challenging those determinations. Among other things, the suits challenged HRSA's interpretation of 340B as requiring manufacturers to accede to covered entities' demands that they provide, without limitation or condition, 340B-priced drugs to all "contract pharmacies." *Id.* at \*6.

The D.C. Circuit rejected the assertion that 340B requires manufacturers to provide 340B-priced drugs to an unlimited number of contract pharmacies. *Novartis*, 102 F.4th at 459-60. As the D.C. Circuit concluded, Congress chose to impose only certain restrictions on 340B-participating manufacturers, including specifically that they make a "bona fide" offer. *Id.* at 460-64. This means that manufacturers remain free to impose "conditions on the distribution of covered drugs to covered entities," so long as those conditions are reasonable and consistent with the federal statute. *Id.* at 464. In short, the D.C. Circuit opinion defined the outer boundary of federal obligations to deliver 340B-priced drugs to contract pharmacies. *Id.* at 459-64.

The Third Circuit similarly rejected an unlimited contract pharmacy requirement. *Sanofi*, 58 F.4th at 703-04 ("Nowhere 0does Section 340B mention contract pharmacies."). To the contrary, the court noted that "Congress's use of the singular 'covered entity' in the [statute's] 'purchased by' language suggests that it had in mind one-to-one transactions between a covered entity and a drug maker *without mixing in a plethora of pharmacies*." *Id.* at 704 (emphasis added); *id.* (340B does not "require[] delivery to an unlimited number of contract pharmacies"). It also enjoined the federal government from imposing this requirement. *Id.* at 706-07; *id.* at 703-04.

10

### B.    Utah Senate Bill 69

On March 27, 2025, Utah enacted S.B. 69.  S.B. 69's regulatory object is to change the terms of manufacturers' 340B participation.  *See* Utah Code § 31A-46-102(1)-(2) (referring to and relying on 340B).

It instructs that "[a] manufacturer may not directly or indirectly restrict or prohibit" (a) pharmacies and 340B entities from contracting, "including by denying [the pharmacy or 340B entity] access to a drug that is manufactured by the manufacturer"; (b) "the acquisition, dispensing, or delivery of a 340B drug to any location authorized by a 340B entity to receive the drug, unless prohibited by federal law"; or (c) "a 340B entity from receiving 340B drug discount program pricing for a 340B drug, including by imposing a time limitation on a 340B entity to replenish or submit a claim for a 340B drug."  *Id.* § 31A-46-311(2)(a).  It also provides that "[a] manufacturer may not directly or indirectly require a 340B entity to" (a) "purchase a 340B drug from a supplier if the manufacturer would otherwise permit the 340B entity to purchase a drug that is not a 340B drug from the supplier" or (b) "submit any claim data, utilization data, or information about a 340B entity's contracts with a third-party as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity, unless the data or information sharing is required by federal law."  *Id.* § 31A-46-311(2)(b).  Finally, it specifies that "[a] manufacturer may not interfere with" (a) "a contract between a pharmacy and a 340B entity" or (b) "the ability of a pharmacy and a 340B entity to enter into a contract."  *Id.* § 31A-46-311(2)(c).

S.B. 69 is not about access to drugs:  PhRMA members already sell and ship their drugs to the same pharmacies at commercial prices.  Exh. 3, McCarthy Decl. ¶¶ 6-8; Exh. 2, Costello Decl. ¶¶ 10-11.  Thus, S.B. 69 does not address any question about drug availability.  Instead, S.B. 69, by defining "340B drug" in reference to the federal pricing obligation, purports to punish manufacturers based on the prices charged for drugs.

11

S.B. 69 subjects manufacturers to potential civil and criminal liability. *Id.* § 31A-46-401; *id.* § 31A-2-201(4); *id.* § 31A-2-308(9). Civil penalties include forfeiture of up to twice the amount of any profit and a penalty of up to $5,000 per violation. *Id.* § 31A-2-308(1)(a), (b)(ii).

## ARGUMENT

When a party seeks preliminary injunctive relief, a court considers whether the party is "likely to succeed on the merits," whether it will be "irreparably injured absent a stay," "whether issuance of [injunctive relief] will substantially injure the other parties interested in the proceeding," and "where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 425-26 (2009). Where the government is the opposing party, the last two factors merge. *Id.* at 435. This case easily satisfies the merits and balance-of-the-equities inquiries.

## I.  PHRMA IS LIKELY TO SUCCEED ON THE MERITS

The Supremacy Clause provides that the "Constitution, and the Laws of the United States," are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Congress may impliedly preempt a state law under either field or conflict preemption principles. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 872-73 (2000). S.B. 69 fails under both inquiries.

### A.  S.B. 69 Conflicts with the Federal Regime Created By Congress

Where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000), or "interferes with the methods by which the federal statute was designed to" achieve those purposes and objectives, it is conflict preempted, *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492, 494 (1987) (state law preempted because it would "upset[] the balance of public and private interests so carefully addressed by the [federal statute]"). S.B. 69 conflicts under those principles.

*First*, the Act conflicts with 340B by regulating the terms of a *federal offer* under a *federal program* and fundamentally altering the balance Congress struck in 340B. *See Novartis*, 102 F.4th at 460-64; *Sanofi*, 58 F.4th at 704-06. Congress designed 340B to provide a unique federal benefit—a substantial price reduction to specific, statutorily defined healthcare providers. 340B works through a carefully calibrated incentive structure. To force drug manufacturers to provide 340B pricing, Congress generally conditioned their ability to receive federal Medicaid and Medicare Part B reimbursements for their covered outpatient drugs on participation in 340B. But because continued access to these manufacturers' drugs is crucial to individuals covered by those other programs, Congress limited the scope of 340B obligations to avoid over-imposing on manufacturers, whose departure from 340B would mean withdrawing from participation in Medicare and Medicaid. *Astra*, 563 U.S. at 114, 120. Yet S.B. 69 seeks to impose its own requirement for what constitutes a legitimate 340B "offer," thus forcing manufacturers to make transactions at the federal 340B price when those very same transactions *would not* be required under the federal program alone. In forcing those additional transactions, S.B. 69 greatly expands the subsidy borne by manufacturers far beyond that contemplated by Congress.

Courts, including the D.C. and Third Circuits, have concluded that manufacturers' obligations do not encompass providing 340B-priced drugs to an unlimited number of contract pharmacies—the exact requirement Utah seeks to impose here. *Novartis*, 102 F.4th at 460. The D.C. Circuit explained that Congress's choice "preserve[d]—rather than abrogate[d]—the ability of sellers to impose at least some delivery conditions." *Id.* And it made clear Congress imposed the governing constraints on how manufacturers may operate vis-à-vis "offers" of 340B-priced drugs. *Id.* at 462-64. Each manufacturer offer must be "bona fide," which the court stated means that certain "onerous conditions might violate the statute." *Id.* at 464. But that determination is for the federal government, reviewed by federal courts, to make. *Id.* at 462-64 (stating "courts can

13

sensibly adjudicate questions" regarding what constitutes a bona fide offer).  In other words, manufacturers' obligation to provide the 340B price extends only to shipments directly to covered entities, but not to an unlimited number of contract pharmacies.  Thus, manufacturers remain free to impose "conditions on the distribution of covered drugs to covered entities."  *Id.* at 464.

The Third Circuit's decision in *Sanofi* likewise rejected the very same obligation Utah seeks to impose here and enjoined the federal government from imposing it.  58 F.4th at 703-04, 706. The Third Circuit noted that "Congress's use of the singular 'covered entity' in the [statute's] 'purchased by' language suggests that it had in mind one-to-one transactions between a covered entity and a drug maker *without mixing in a plethora of pharmacies*."  *Id.* (emphasis added); *id.* at 704 (340B does not "require[] delivery to an unlimited number of contract pharmacies").

Covered entities are thus given a choice when manufacturers include reasonable conditions permitted as part of a 340B offer.  Exh. 3, McCarthy Decl. ¶¶ 12-13; Exh. 2, Costello Decl. ¶¶ 14-15.  Under fundamental principles of contract law, if covered entities accede to those conditions, they accept the terms of the offer and may purchase 340B-priced drugs.  2 Williston on Contracts § 6:11 (4th ed.) ("Thus, if an act is requested [as part of an offer], that very act and no other must be performed.").  If covered entities reject the conditions, the offer is rejected and no purchase of the 340B-priced drugs occurs.  *Id.* ("[B]ecause the offeror is entitled to receive what it is it has bargained for, if any provision is added to which the offeror did not assent, the consequence is . . . that the offer is rejected, and that the offeree's power of acceptance thereafter is terminated.").  Accordingly, by permitting the inclusion of reasonable terms and requiring acceptance of those terms to obtain the 340B price, Congress has tied the scope of obligations to the terms of a permissible 340B offer.  And covered entities and contract pharmacies, of course, remain free to purchase the same drugs at the commercial price, with delivery to the *same* pharmacies.

S.B. 69 bars those same conditions.  Instead, it forces manufacturers to engage in many more transactions *at the 340B price* than federal law requires.  That directly conflicts with Congress's chosen scope for the federal program.  *See Forest Park II v. Hadley*, 336 F.3d 724, 730, 732-33 (8th Cir. 2003) (holding that where Congress enacts a program like this one and sets the obligations of private parties under it, additional state obligations conflict with the federal scheme, whether or not they purportedly serve the same "purpose"); *see also Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 326 (2016) (state law preempted that "impose[d] duties . . . inconsistent with the central design" of federal law); *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 531 (5th Cir. 2013) (laws that "interfere[] with the careful balance struck by Congress" are conflict preempted).[5]

Similar is true as to S.B. 69's broad prohibition on manufacturers "directly or indirectly" requiring a covered entity or a contract pharmacy to submit "any claim [or] utilization data" or "information about a 340B entity's contracts with a third-party."  Utah Code § 31A-46-311(2)(b). Multiple courts have concluded that manufacturers may impose such conditions, and that those conditions on a 340B offer satisfy the federal obligation.  *See Novartis*, 2021 WL 5161783, at *8-9 (holding that, under federal law, manufacturers are permitted to require certain types of data as a precondition of their "offer" of 340B-priced drugs); *Novartis*, 102 F.4th at 463 (affirming).

*Second*, S.B. 69's bar on the collection of claims data also conflicts with 340B by effectively cutting off manufacturers from utilizing the federal enforcement regime and determining if unlawful diversion or duplicate discounting is occurring.  *Morrisey*, 2024 WL 5147643, at *5-7.  Manufacturers must audit covered entities prior to utilizing ADR.  42 U.S.C.

---

[5] Utah may contend S.B. 69 regulates delivery, not pricing.  But that argument does not hold up when considering what S.B. 69 *actually* penalizes.  Manufacturers currently deliver drugs to these same pharmacies, just at commercial prices.  A violation of S.B. 69 results not from failing to deliver but instead from failing to provide the *340B price* on drugs delivered to the pharmacies.

§ 256b(d)(3)(B)(iv); 89 Fed. Reg. 28,643, 28,644 (Apr. 19, 2024) (stating "manufacturers are required to audit a covered entity prior to filing an ADR claim").  Audits, in turn, are conducted "in accordance with procedures established by the Secretary."  42 U.S.C. § 256b(a)(5)(C).  HRSA, which oversees ADR, has required manufacturers to first audit a covered entity before accessing ADR, and manufacturers are only permitted to conduct an audit where they "ha[ve] documentation which indicates that there is reasonable cause."  61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996); *see also Novartis*, 2021 WL 5161783, at *7.  "Reasonable cause" is defined to mean "that a reasonable person could believe that a covered entity may have violated" the prohibitions on transfer or sale, or on duplicate discounting.  61 Fed. Reg. at 65,409.

Accordingly, to even access the audit process, manufacturers must be able to gather information that will allow them to determine if reasonable cause exists to suspect a covered entity is violating 340B's provisions—access that S.B. 69 cuts off.  *See Novartis*, 2021 WL 5161783, at *8 (explaining that United Therapeutics "convincingly argues that the claims data conditions that it has added to its new 340B policy will enable it to better utilize the anti-fraud audit and ADR procedures that Congress established for manufacturers in Section 340B").

S.B. 69 would prohibit such reasonable restrictions on 340B drug sales and create a significant obstacle to the program's audit and ADR process.  This creates a direct conflict with the federal regime.  As the *Morrisey* court stated:  "By restricting the very method by which data collection is made, [the state statute] frustrates drug manufacturers' ability to take the initial steps necessary to start the very audit required to access" ADR and thus "stands as an obstacle to achieving the federal objective of preventing fraud in" 340B.  2024 WL 5147643, at *6-7.  S.B. 69 directly subverts availability of the federal enforcement mechanism.

That conflict is reinforced by S.B. 69's impact on rooting out duplicate discounting.  Under the new Medicare Drug Price Negotiation Program, HHS is to "negotiate" with manufacturers the

"maximum fair price[s]" for certain drugs.  42 U.S.C. § 1320f-3(a).[6]  Manufacturers must provide drugs under these so-called maximum fair prices, except when drugs are 340B eligible and the 340B price is lower.  *Id.* § 1320f-2(d).  To avoid duplicating price reductions, this scheme necessarily requires identifying when a drug is dispensed as a 340B drug, a burden the Centers for Medicare and Medicaid Services ("CMS") places on manufacturers.[7]  As a result, manufacturers require claims data to avoid providing duplicative price reductions.  Yet, S.B. 69 bars its collection.

*Third*, the Act conflicts with Congress's chosen scheme of exclusive federal oversight.  *See Astra*, 563 U.S. at 113; *see also Buckman v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349-50 (2001) (where agency had "a variety of enforcement options that allow it to make a measured response," greenlighting state-law tort claims would "inevitably conflict with the [agency's] responsibility to police fraud consistently with [its] judgment and objectives").  In *Astra*, covered entities operated by Santa Clara County brought suit to enforce 340B pricing against drug manufacturers directly rather than bringing that issue to HRSA.  *See* 563 U.S. at 116-17.  Two things happened.  First, in response to such disputes, Congress stepped in and amended the 340B statute to add detailed administrative enforcement mechanisms—all to be overseen by HRSA, subject to federal court review.  42 U.S.C. § 256b(d).  Second, the Supreme Court ruled against Santa Clara County, explaining that the new federal agency administrative enforcement mechanisms were the "proper remedy" for disputes about the operation of 340B.  *Astra*, 563 U.S. at 119-22.  The Court stressed repeatedly that it was essential for 340B to be administered "harmoniously and on a uniform, nationwide basis" through HRSA.  *Id.* at 120.

---

[6] PhRMA members Boehringer Ingelheim Pharmaceuticals, Bristol Myers Squibb Company, Astellas, and Merck have drugs subject to the Medicare Drug Price Negotiation Program.

[7] CMS, Medicare Drug Pricing Negotiation Final Guidance 60 (Oct. 2, 2024), https://tinyurl.com/3sx8hmah; *see also* CMS, Medicare Drug Price Negotiation Program Draft Guidance 48 (May 3, 2024), https://tinyurl.com/dapyyjyf.

S.B. 69, like the claims considered in *Astra*, similarly conflicts with the unitary federal enforcement regime. In fact, federal ADR regulations issued in 2024 make clear HRSA's view that it has federal statutory authority to address the same issues as S.B. 69, including through ADR. *See* 89 Fed. Reg. at 28,649 (defining overcharge claim, to be brought via ADR, to encompass "a claim that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price or the manufacturer does not offer the 340B ceiling price"). In other words, the federal government believes it has authority to address the same issue that S.B. 69 purports to regulate. *Id.*; 42 U.S.C. § 256b(d)(1) (covering "overcharges and other violations of the discounted pricing requirements").

And covered entities, including Utah covered entities, have taken the same position as the federal government. Intermountain Healthcare, the Chief Strategy Officer of which helped introduce S.B. 69 in Committee, filed a comment letter when the ADR regulation was under consideration, urging HRSA to adopt a definition of "overcharging" that encompassed "manufacturer policies cutting off or conditioning access to 340B pricing for contract pharmac[ies]." Intermountain Health, *Comments on Proposed Changes to the 340B Administrative Dispute Resolution* 1 (Docket No. HRSA-2021-000X), https://tinyurl.com/ykhsuh5v. As Intermountain explained its view, "[w]hen a manufacturer refuses to offer a 340B price for a drug or sets conditions on accessing that price, it necessarily means a covered entity must pay more for the drug than the 340B ceiling price or otherwise incur potentially costly fees to meet the manufacturer's unilaterally imposed conditions, essentially depriving covered entities true access to the statutory price." *Id.* Accordingly, Intermountain argued, "it is appropriate for an ADR panel to consider these claims because such claims would be based on a violation of a manufacturer's 340B statutory obligations." *Id.* Other covered entities

have also raised these contract pharmacy policy disputes via ADR. *Supra* at 6 n.1. Yet Utah seeks to address the very same dispute, contra to *Astra*. *Morrisey*, 2024 WL 5147643, at *9-10.

A preview of potential state enforcement proceedings drives the impermissible conflict home. Utah has yoked S.B. 69 to 340B. Accordingly, determining whether a manufacturer violated S.B. 69 requires determining if there was an underlying 340B obligation in the first place. To make the latter determination, a decisionmaker will need to answer several federal law questions, including: (1) whether the drugs are actually covered outpatient drugs under 340B; (2) whether they are eligible for 340B pricing; (3) whether the manufacturer provided the 340B price; (4) whether there has been diversion or duplicate discounting (which includes determining whether a specific drug was distributed to a covered entity's "patient"); and (5) whether a covered entity is a 340B covered entity under federal law. *See Morrisey*, 2024 WL 5147643, at *11.

This conflict strikes at the heart of the federal government's ability to uniformly apply and enforce 340B nationwide. *Arizona v. United States*, 567 U.S. 387, 406 (2012); *see also Wis. Dep't of Indus., Labor & Human Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986). And it ultimately compromises the federal government's ability to balance the interests of 340B, Medicare, and Medicaid, precisely in the way that *Astra* found problematic. *See Astra*, 563 U.S. at 120 ("Recognizing the [] right to proceed in court could spawn a multitude of dispersed and uncoordinated lawsuits[.]"). The *Morrisey* court (the first court to seriously contend with *Astra*) concluded as much, recognizing that *Astra*'s "holding … controls." 2024 WL 5147643, at *9-11.

*Finally*, S.B. 69 conflicts by unbalancing the federal enforcement regime. S.B. 69 gives state decisionmakers the right to impose a remedy, criminal penalties, "withheld from [a federal agency]." *San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236, 247 (1959). S.B. 69 also wholly ignores that Congress carefully calibrated HHS's power to levy civil monetary penalties, by requiring it to undertake several other steps first. 42 U.S.C.

19

§ 256b(d)(1)(B) (Secretary should "inquir[e]" into "pricing discrepancies," have manufacturers take "corrective action," and use audits).  S.B. 69 thus lacks the nuanced approach adopted by Congress to foster compliance through corrective measures rather than punitive actions.  The introduction of a separate state enforcement scheme destroys Congress's chosen framework and deters manufacturers from participating in 340B, contrary to Congressional intent.

The Supremacy Clause does not permit Utah to adopt a regulatory scheme that destroys the uniformity Congress intended and upsets the bargain Congress struck in governing a federal benefits program.  *See Buckman*, 531 U.S. at 350.  The problem will only intensify if the Act stands and other states continue to adopt their own preferred 340B obligations.  With 50 states separately enforcing their own visions of 340B, the delicate equilibrium required to administer the program will be destroyed.  *See Gould*, 475 U.S. at 286 ("'[C]onflict is imminent' whenever 'two separate remedies are brought to bear on the same activity.'"); *see also City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 639 (1973) (recognizing danger of "fractionalized control").

**B.      S.B. 69 Intrudes On The Exclusively Federal Field Of 340B's Operation**

Field preemption exists where (1) Congress's "framework of regulation [is] 'so pervasive'" that Congress has "left no room for the States to supplement it," or (2) where there is a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399.  Field preemption is especially likely where a state law "diminish[es] the [federal government]'s control over enforcement and detract[s] from the integrated scheme of regulation created by Congress." *Id.* at 402.

As the Supreme Court recognized, Congress created a comprehensive federal program in 340B, centralized enforcement of that program exclusively within HHS, and made the provisions of 42 U.S.C. § 256b(d) the "proper remedy" for disputes regarding the 340B program. *See Astra*, 563 U.S. at 110, 119-122; *see also* 89 Fed. Reg. at 28,649.  Those considerations  mirror what

20

courts consider in the field preemption context. *See NLRB v. Nash-Finch Co.*, 404 U.S. 138, 144 (1971); *Arizona*, 567 U.S. at 402; *Buckman*, 531 U.S. at 341. Congress made 340B a closed system. It carefully delineated the obligation of manufacturers via the offer provision. And Congress explicitly enumerated the fifteen categories of intended beneficiaries—the covered entities—with a high degree of specificity to limit 340B's bounds. 42 U.S.C. § 256b(a)(1), (4); *see AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47, 60 (D. Del. 2021). Congress then barred covered entities from even "transfer[ring]" 340B-priced drugs to anyone other than a patient. 42 U.S.C. § 256b(a)(5)(B). This diversion prohibition reinforces that Congress intended to limit the manufacturers' subsidy within strict bounds.

Congress also created a multi-faceted administrative enforcement scheme centralized within HHS to ensure uniformity and keep the system circumscribed to facilitate manufacturer participation. HRSA may audit manufacturers and covered entities to ensure compliance and, in specific circumstances, impose sanctions on covered entities and civil monetary penalties on manufacturers. *Id.* §§ 256b(d)(1)(B)(ii)-(iv), (a)(5)(C). The statute also directed HHS to establish ADR. *Id.* § 256b(d)(3)(B), (C). Covered entities have invoked the ADR process and claimed it is the appropriate mechanism to raise disputes over contract pharmacies' role in 340B.

As the federal government has argued and the Supreme Court has held, this detailed oversight and enforcement is "intended to be exclusive." Br. for the United States as *Amicus Curiae* at *10, *Astra*, No. 09-1273, 2010 WL 4717264 (U.S. Nov. 19, 2010). In the federal government's words, by choosing to centralize these functions in HHS, Congress codified its assessment that HHS "is best positioned to determine manufacturers' obligations in the first instance." *Id.* at *33. Congress thus chose to vest HHS and the federal courts—rather than 50 individual states—with the power to make measured determinations on disputes, enforcement, and penalties. *See* Oral Arg. at 0:41-0:49, *United Therapeutics Corp. v. Johnson*, No. 21-5304 (D.C.

21

Cir. Jan. 20, 2023) (Government attorney: 340B "represents a carefully calibrated scheme that entrusts HHS with oversight"). The field of 340B's operation is exclusively federal.

The Act impermissibly intrudes into that exclusive federal field both substantively and procedurally. S.B. 69 invades the field substantively by purporting to define as a matter of state law the scope of manufacturers' 340B obligations, in contravention of holdings by the Third Circuit and the D.C. Circuit. *Novartis*, 102 F.4th 460-64; *Sanofi*, 58 F.4th at 703-04; *see supra* at 13-16. S.B. 69 also invades the federal field procedurally by creating its own scheme of oversight and enforcement, in competition with federal enforcement and ADR processes. Because S.B. 69 explicitly punishes any effort by manufacturers to deny, restrict, prohibit, or interfere with "the acquisition, dispensing, or delivery" of a 340B-priced drug—not the same drug at market price— S.B. 69 necessarily seeks to punish manufacturers for failing to provide drugs at the *340B price*. Utah Code § 31A-46-102(1) (defining "340B drug" in reference to the federal pricing benefit).

Despite the comprehensive and exclusive regime Congress created, S.B. 69 grants Utah's Insurance Department and Attorney General authority for independent investigations into 340B drug sales, which will (as the *Astra* Court predicted) create contradictory results. Utah thus usurps the federal agency's authority to make exclusive discretionary judgments regarding enforcement and compromises the federal agency's ability to balance the interests of 340B, Medicare and Medicaid. *See Astra*, 563 U.S. at 120 (noting the danger of "HHS [being] unable to hold the control rein"). 340B creates an exclusive field of federal authority into which Utah cannot tread. *See Arizona*, 567 U.S. at 402-03; *Gould*, 475 U.S. at 288 ("Each additional [state] statute incrementally diminishes the [federal government]'s control.").

At bottom, the inquiry here is fundamentally the same as in *Astra*: Would Congress have intended for states to insert themselves into 340B to resolve disputes about contract pharmacies

22

outside the established remedial scheme? *See, e.g.*, *Arizona*, 567 U.S. at 399. The Supreme Court in *Astra* provided the answer: *No.*

## II.  THE REMAINING FACTORS FAVOR AN INJUNCTION

PhRMA's members will be irreparably harmed absent relief. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). Without injunctive relief, PhRMA's members will suffer irreparable harm in the form of unrecoverable compliance costs and unrecoverable lost resources, among other things, or face Utah's imposition of criminal and civil penalties.

Under S.B. 69, manufacturers must provide millions of dollars in price concessions where they would not otherwise be required under federal law. Once given, there is no clear mechanism to recover for 340B-priced drugs provided to comply with a state law. To the extent one is conceivably available, manufacturers would need to institute many actions against many covered entities, creating an administrative burden that would engulf any recovery. As a result, PhRMA members would have "[d]ifficulty in collecting a damage judgment," which supports a finding of irreparable harm. *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986); *see also Lee v. Bickell*, 292 U.S. 415, 421 (1934). Manufacturers' practical inability to recover 340B price concessions constitutes irreparable injury.

Furthermore, S.B. 69 creates immediate and substantial compliance costs for PhRMA's members. PhRMA's members have already and will continue to expend significant time and financial resources in analyzing the effects of the Act, determining how to comply with both the Act and federal law. Exh. 3, McCarthy Decl. ¶¶ 18-20; Exh. 2, Costello Decl. ¶¶ 18-21; *see also* Declaration of James C. Stansel, attached hereto as Exhibit 1, ¶ 14 (hereinafter, "Stansel Decl."). PhRMA's members have already devoted hundreds of hours and hundreds of thousands of dollars to determine how the requirements of S.B. 69 will be implemented. Exh. 3, McCarthy Decl. ¶ 18; Exh. 2, Costello Decl. ¶ 20; Exh. 1, Stansel Decl. ¶ 14. Members will be required to continue to

23

devote funds and resources to ensuring compliance with S.B. 69 and will likely, in some cases, be required to retain outside assistance by contracting with a company to help ensure compliance with the law.  Exh. 3, McCarthy Decl. ¶ 19; Exh. 2, Costello Decl. ¶ 21; Exh. 1, Stansel Decl. ¶ 14; *Cloud Peak Energy Inc. v. United States Dep't of Interior*, 415 F. Supp. 3d 1034, 1043 (D. Wyo. 2019) ("[M]onetary costs necessary to comply with the new [] Rule, which are not later recoverable even if Petitioners win this litigation on its merits, constitute irreparable injury."); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1130 (D. Utah 2024) ("unrecoverable expenses in the form of either civil penalties or compliance costs" count as irreparable harm); *Free Speech Coal. v. Gonzales*, 406 F. Supp. 2d 1196, 1211 (D. Colo. 2005).  Manufacturers will also be forced to set up mechanisms to attempt to monitor 340B compliance at a host of contract pharmacies that would otherwise not be involved in 340B.  Those costs are unrecoverable given Utah's sovereign immunity.  *See Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury.").

Significantly, these expenditures of time and funds will also divert manufacturer resources from investment in research and development and other priorities, which will have far-reaching impacts.  Exh. 3, McCarthy Decl. ¶ 19; Exh. 2, Costello Decl. ¶¶ 5-7, 21; *Schmeisser GmbH v. AC-Unity d.o.o*, No. 21-CV-24-SWS, 2021 WL 7286256, at *11 (D. Wyo. Mar. 19, 2021) ("Irreparable harm can be shown by many instances of harm, including likelihood of price erosion, loss of market position, loss of revenue, loss of goodwill, or loss of research and development."). Finally, manufacturers face criminal and civil penalties and irreparable reputational harm from having their policies, which comply with federal law, branded "criminal."  *Core Progression Franchise LLC v. O'Hare*, No. 21-cv-0643, 2021 WL 1222768, at *9 (D. Colo. Apr. 1, 2021) ("[I]rreparable harm stems from the difficulty in calculating damages and the intangible harms

24

Plaintiff has suffered such as loss of goodwill."), *aff'd* 2022 WL 1741836, at *3 (10th Cir. 2022) (considering "harm to goodwill").

The balance of harms and public interest also favor relief. Preliminary injunctive relief is intended to preserve the status quo. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258-59 (10th Cir. 2005). Here, the federal government has long, in accordance with *Astra*, regulated 340B exclusively without state intrusion, and PhRMA's members have operated under that scheme and relied on its exclusively federal nature. This case does not concern reduced pricing for patients; it instead relates to covered entities and their use of for-profit pharmacies, which obtain windfall pricing benefits. Indeed, as Governor Cox recognized, S.B. 69 "does not require cost savings to be passed onto patients and is not transparent in how cost savings are used." *See supra* at 3-4. Utah's intrusion upends the status quo and the federal government's control over a federal area, favoring an injunction. *Seneca-Cayuga Tribe of Okla. v. State of Okla. ex rel. Thompson*, 874 F.2d 709, 716 (10th Cir. 1989) (stating there is "no cognizable state interest in enforcing [state] laws preempted by federal law"); *Edmondson*, 594 F.3d at 771 (similar).

## CONCLUSION

PhRMA respectfully requests the Court grant its motion for preliminary injunctive relief. [8]

---

[8] PhRMA respectfully requests argument pursuant to DUCivR 7-1(g). Good cause exists given the significant constitutional issues raised and that argument would allow the parties to assist the Court in evaluating those issues.

25

Dated: April 28, 2025

Respectfully submitted,
KIRTON McCONKIE

s/ *Peter C. Schofield*
Allen M. Gardner
Peter C. Schofield
Christopher Sanders

Philip J. Perry
Andrew D. Prins
Abid R. Qureshi
LATHAM & WATKINS LLP

*Attorney for Plaintiff*

26