DAVID N. WOLF (6688)
LANCE SORENSON (10684)
JASON DUPREE (17509)
Assistant Utah Attorneys General
Office of the Utah Attorney General
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (385) 584-6509
dwolf@agutah.gov
lancesorenson@agutah.gov
jndupree@agutah.gov
*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, <br><br> *Plaintiff*, <br><br> v. <br><br> DEREK BROWN, in his official capacity; and JOHN PIKE, in his official capacity, <br><br> *Defendants*. | **MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> Case No. 2:25-cv-00308-RJS-DAO <br><br> Judge Robert J. Shelby <br><br> Magistrate Judge Daphne A. Oberg |

# TABLE OF CONTENTS

BACKGROUND ....................................................................................................... 5

1.  Congress established Section 340B to shield Covered Entities from drug price increases and help Covered Entities reach more patients and provide more services ........ 5

2.  The 340B Program regulates price, but not delivery ......................................... 6

3.  HRSA recognizes that a Covered Entity using multiple contract pharmacies helps fulfill the 340B Program's aims .............................................................................. 8

4.  Drug manufacturers implement policies that prevent Covered Entities from serving patients in need ....................................................................................................... 10

5.  Utah's Law ......................................................................................................... 12

LEGAL STANDARD ............................................................................................... 13

ARGUMENT ............................................................................................................ 14

1.  PhRMA doesn't meet its burden to demonstrate a substantial likelihood of success on the merits of its preemption claims .............................................................. 14

2.  PhRMA will not suffer irreparable harm from SB69 ....................................... 15

3.  The balance of equities and public interest weigh against granting a preliminary injunction ............................................................................................................. 16

CONCLUSION ......................................................................................................... 24

# TABLE OF AUTHORITIES

CASES

*AbbVie Inc. v. Fitch*,
    2024 WL 3503965 (S.D. Miss. July 22, 2024) ..................................................... 5, 12

*Am. Hosp. Ass'n v. Becerra*,
    596 U.S. 724 (2022) ................................................................................... 5, 6

*Astra USA, Inc. v. Santa Clara Cnty.*,
    563 U.S. 110 (2011) ................................................................................... 5, 8

*AstraZeneca v. Fitch*,
    No. 1:24CV196-LG-BWR, 2024 WL 5345507 (S.D. Miss. Dec. 23, 2024) ........................... 12

*Eccles v. Peoples Bank of Lakewood Village, Cal.*,
    333 U.S. 426 (1948) ...................................................................................... 13

*Genesis Health Care, Inc. v. Becerra*,
    2023 WL 7549156 (D.S.C. Nov. 3, 2023) ............................................................. 5, 6

*Heideman v. So. Salt Lake City*,
    348 F.3d 1182 (10th Cir. 2003) .............................................................. 13, 15, 23

*Maryland v. King*,
    567 U.S. 1301 (2012) ............................................................................. 13, 23

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ..................................................................................... 13

*Novartis Pharms. Corp. v. Johnson*,
    102 F.4th 452 (D.C. Cir. 2024) .............................................................. 8, 9, 10

*Novartis Pharms. v. Bailey*,
    No. 2:24-cv-04131-MDH, 2025 WL 489881 (W.D. Mo. Feb. 13, 2025) ........................... 11

*Novartis Pharms. v. Fitch*,
    738 F. Supp. 3d 737 (S.D. Miss. 2024) ................................................................ 12

*PhRMA v. Fitch*,
    No. 1:24-CV-160-HSO-BWR, 2024 WL 3277365 (S.D. Miss. July 1, 2024) ........................ 12

*PhRMA v. McClain*,
  95 F.4th 1136 (8th Cir.), cert. denied, 145 S. Ct. 768 (2024) ............................Passim

*PhRMA v. Morrisey*,
  760 F. Supp. 3d 439 (S.D.W. Va. 2024) ............................................................ 12

*PhRMA v. Murrill*,
  No. 6:23-cv-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) ..................... 11

*Rocky Mountain Gun Owners v. Polis*,
  121 F.4th 96 (10th Cir. 2024) ........................................................................... 16

*Sanofi Aventis v. United States Dep't of Health & Hum. Servs.*,
  58 F.4th 696 (3d Cir. 2023) ........................................................................ 7, 8, 9

*Schrier v. Univ. Of Co.*,
  427 F.3d 1253 (10th Cir. 2005) ........................................................................ 13

*Wisconsin Dept. of Health and Family Services v. Blumer*,
  534 U.S. 473 (2002) .......................................................................................... 24

STATUTES

42 U.S.C. § 256b ........................................................................................ 1, 5, 6, 7

Utah Code § 31A-2-201(1) ................................................................................ 13

Utah Code § 31A-46-311 ............................................................................. 12, 13

REGULATIONS

Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services,
  75 Fed. Reg. 10,272 ................................................................................. 3, 9, 10

Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy
  Services,
  61 Fed. Reg. 43,549 (Aug. 23, 1996) ................................................................. 8

OTHER AUTHORITIES

S.B.69 Medication Amendments ...................................................................Passim

iv

# INTRODUCTION

From the urban areas of the Wasatch Front to the rural towns in Sanpete County, to the Navajo Nation in the Four Corners, no two regions in Utah are alike. This presents unique challenges for Utah's healthcare providers who serve wide-ranging patient populations that span dozens, or even sometimes hundreds, of miles. To take just one of many examples, Health West is a federally qualified health center ("FQHC")[1] providing medical, dental, and behavioral health services (including prescription drugs) to patients regardless of their ability to pay. Health West has fifty-nine contract pharmacy locations because of its large geographic footprint and the rural nature of the communities it serves, with patients in 23 of Utah's 29 counties. Health West's patients live over a wide physical area, rendering frequent visits to Health West pharmacies untenable.[2]

Not only do Utah's citizens come from a variety of geographic spaces, but they also come from a variety of socio-economic backgrounds, with many who are poor, uninsured and underinsured. Utah's healthcare providers are committed to providing healthcare to all Utahns, regardless of ability to pay.[3] Utah's fourteen FQHCs, especially, serve these communities. There are 59 FQHC clinics across the State of Utah serving rural, frontier, and underserved urban communities. Two FQHCs operate specialty clinics that serve people experiencing homelessness

---

[1] FQHCs receive federal funding under Section 330 of the Public Health Service Act and serve underserved areas and populations. *See* 42 U.S.C § 254b *et seq*.

[2] *See* Declaration of Mark Horrocks, Chief Medical Officer of Health West, Inc. ("Horrocks Dec."), attached hereto as Exhibit 1, paragraphs 2,3, 5, and 7.

[3] *See, e.g*., Declaration of Kevin Forbush, System Director of the 340B Pricing Program for Intermountain Health ("Forbush Dec."), attached hereto as Exhibit 2, paragraph 5; *see also* Declaration of Charlton Park, Chief Financial and Analytics Officer of University of Utah Health ("Park Dec."), attached hereto as Exhibit 3, paragraph 5.

in addition to their other clinics; one FQHC serves only the homeless; two FQHCs are affiliated with the Native American tribes; and three FQHCs coordinate with their local school districts to support care for students and their families.[4]

FQHCs must provide primary and preventive medical, dental, and behavioral health services to all patients regardless of their ability to pay and must provide services to patients with incomes below 200% of the federal poverty limit on a sliding-fee scale. In 2023, Utah's FQHCs served 139,977 patients, 45% of whom were uninsured, 28% of whom had Medicaid or Medicare coverage, and 27% of whom had private health insurance. Of these patients, 87% reported their income below 200% of the federal poverty limit and 53% reported their income as below 100% of the federal poverty limit. As a result of providing care to Utah's most vulnerable, Utah's FQHCs have thin operating margins, even when compared to FQHCs nationwide. For every $1 in Health Resources and Services Administration funding they receive, Utah's FQHCs had to offset $3.01 in non-funded expenses through other sources (compared to just $0.58% funding nationally).[5]

Congress created a program to help hospitals and healthcare facilities that serve low-income and rural communities. The 340B drug discount program requires drug manufacturers who participate in Medicaid and Medicare to provide discounted pricing on drugs to "Covered Entities," which are local public and not-for-profit hospitals, community centers, and clinics that provide medical care for the poor. The purpose of the 340 Program is to protect Covered Entities from drug price increases and enable Covered Entities to stretch scarce resources as far as possible, reaching more patients.

---

[4] *See* Declaration of Alan Pruhs, Executive Director of the Association for Utah Community Health ("Pruhs Dec."), attached hereto as Exhibit 4, paragraphs 2-4.
[5] *See* Pruhs Dec., Exhibit 4, paragraphs 5-7.

In order for Covered Entities to meet Congress's goal of reaching more patients, they often contract with pharmacies to dispense drugs purchased through the 340B Program. This makes intuitive sense – prescription drugs must be dispensed to patients through a pharmacy. And, if a Covered Entity contracts with multiple pharmacies, the Covered Entity can serve a wider region and provide healthcare access to patients who face transportation barriers. Some pharmacies specialize in getting drugs to rural areas through the mail or through rural satellite facilities, while others provide brick and mortar outlets in poorer areas. As an example, Mountainlands Family Health Center had an in-house pharmacy in Provo, but also had two small clinics serving patients in Vernal. The distance between Provo and Vernal is 153 miles and the road is challenging or impassable during the winter months. Before Mountainlands could afford building an in-house pharmacy in Vernal, it had a contract pharmacy arrangement in Vernal to provide reasonable access to 340B priced medications for their Vernal patients.[6] The U.S. Department of Health and Human Services recognized that it significantly benefits patients to allow covered entities to use *multiple* contract pharmacy arrangements. *See* 75 Fed. Reg. 10,273, 10,272-73 (Mar. 5, 2010) (hereinafter "2010 Guidance").

Drug companies like Plaintiff Pharmaceutical Research and Manufacturers of America ("PhRMA") have undermined Congress's and Utah's worthwhile goal to expand medical services to as many patients as possible, including the poor and uninsured. PhRMA has tried to stop Covered Entities from using contract pharmacies to dispense 340B drugs by imposing unilateral policy and contractual changes. "This caused covered entities dependent on contract pharmacies to become unable to serve patients in need." *PhRMA v. McClain*, 95 F.4th 1136, 1139 (8th Cir.), cert. denied, 145 S. Ct. 768 (2024).

---

[6] *See* Pruhs Dec., Exhibit 4, paragraph 9.

Because Congress in the 340B program left room for states to legislate drug delivery and distribution, states have started to take action to ensure the purposes of 340B are met. In the 2025 General Legislative Session, Utah joined a growing number of states that have enacted legislation to protect Covered Entities and their patients. Utah enacted Senate Bill 69 ("SB69"), which requires drug manufacturers to deliver 340B drugs, purchased by Covered Entities at federally determined prices, to the Covered Entities' contracting pharmacies.

And here's what SB69 *doesn't* do. SB69 does not regulate drug pricing. SB69 does not compel manufacturers to offer 340B drugs for sale to pharmacies, and SB69 does not entitle pharmacies to purchase drugs at the discounted prices dictated by the 340B Program. SB69 therefore does not conflict with federal law.

This Court should deny PhRMA's Motion for Preliminary Injunction. First, PhRMA cannot show a substantial likelihood of the merits on its preemption claims.[7] The presumption against preemption applies here, and PhRMA does not overcome that presumption. Though Section 340B regulates pricing, the federal law is silent as to delivery. SB69, which addresses drug *delivery*, thus is not preempted. PhRMA cannot establish the first preliminary injunction factor, and that alone is basis to deny its Motion.

PhRMA also fails the remaining factors. PhRMA has not demonstrated irreparable harm because it merely alleges speculative, hypothetical, and uncertain damages. That does not satisfy PhRMA's burden. And the public interest and balancing of the harms weighs strongly in favor of denying the Motion. Enjoining SB69 will "cause[] covered entities dependent on contract

---

[7] Although PhRMA brings two other claims in its Complaint, it seeks a preliminary injunction based only on its preemption claims.

pharmacies to become unable to serve patients in need." *McClain*, 95 F.4th at 1139. This Court should deny the Motion.

## BACKGROUND

**1.    Congress established Section 340B to shield Covered Entities from drug price increases and help Covered Entities reach more patients and provide more services[8]**

Congress established Section 340B of the Public Health Services Act as a pharmaceutical pricing program that "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities." *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011); 42 U.S.C. § 256b. To participate in Medicare and Medicaid, drug manufacturers must opt into the 340B Program by signing a Pricing Agreement with the Secretary of the U.S. Department of Health and Human Services ("HHS"). *Astra*, 563 U.S. at 113. The Agreement requires manufacturers to sell drugs at a discounted price to certain "covered entities." 42 U.S.C. § 256b(a)(1).

Covered Entities are defined by statute to include fifteen different types of public and not-for-profit hospitals, community centers, and clinics that are "dominantly, local facilities that provide medical care for the poor." *Astra*, 563 U.S. at 115; *see also* 42 U.S.C. § 256b(a)(4). These health care providers "perform valuable services for low-income and rural communities but have to rely on limited federal funding for support." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 738 (2022).

---

[8] The following three sections are paraphrased or reproduced verbatim from the summary contained in the Eighth Circuit's opinion in *McClain*, 95 F.4th at 1139, 1141-43, and the Southern District of Mississippi's opinion in *AbbVie Inc. v. Fitch*, No. 1:24-CV-184-HSO-BWR, 2024 WL 3503965, at *2 (S.D. Miss. July 22, 2024).

"[T]he purpose of the 340B program was to provide a means to make 340B entities profitable." *Genesis Health Care, Inc. v. Becerra*, No. 4:19-CV-01531-RBH, 2023 WL 7549156, at *1 (D.S.C. Nov. 3, 2023).[9] Congress enacted Section 340B in response to pharmaceutical manufacturers increasing the prices of drugs. H.R. Rep. No. 102-384(II), at 7-11 (1992)). Congress sought to protect Covered Entities from such price increases because the increases "reduced the level of services and the number of individuals that these hospitals and clinics" could serve. *Id.* at 11.

Congress "intended for the 340B program's drug reimbursements to subsidize other services provided by 340B hospitals." *Am. Hosp. Ass'n*, 596 U.S. at 730, 738. Congress's goal was that "the 340B program would 'enable covered entities to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services.'" *Genesis Health*, 2023 WL 7549156, at *1 (quoting H.R. Rep. 102-384(II), at 12).

## 2.    The 340B Program regulates price, but not delivery

The 340B Program has three components: 1) a cap on drug makers' prices; 2) restrictions on Covered Entities; and 3) compliance mechanisms for both Covered Entities and manufacturers.

---

[9] Indeed, without the 340B program, some Covered Entities might not be able to continue to exist. *See, e.g.*, Pruhs Dec., Exhibit 4, paragraph 12 ("Unless and until these contract restrictions are checked and rolled back, Utah's FQHCs will remain in very vulnerable financial positions"); *see also* Declaration of Jennifer Thomas, Chief Executive Officer of Community Health Centers, Inc. ("Thomas Dec."), attached hereto as Exhibit 5, paragraph 13 ("This ongoing decline in [340B] revenue adversely impacts CHCI's ability to provide services to its patients. In 2024, CHC had to lay off 24% of its staff in large part due to the 340B program"); *see also* Declaration of Clayton H. Holt, Chief Executive Officer of San Juan Health Service District ("Holt Dec."), attached hereto as Exhibit 6, paragraph 9 ("The financial viability of [the Spanish Valley pharmacy] – including construction costs and the employment of a full-time pharmacist – is entirely dependent on 340B savings. Without those funds, the pharmacy would not be operational today").

First, as to pricing: Section 340B requires manufacturers to sell drugs to Covered Entities at a discounted ceiling price, which is determined by a statutory formula. 42 U.S.C. §§ 256b(a)(1)-(2), 1396r-8(c). Section 340B further mandates that discounted prices are only made available to Covered Entities. *Id.* § 256b(a).

Second, 340B contains two provisions that prohibit Covered Entities from abusing their ability to obtain discounted drugs. Covered Entities cannot engage in diversion; meaning, they cannot "resell or otherwise transfer" discounted drugs "to a person who is not a patient of the entity." *Id.* § 256b(a)(5)(B). And Covered Entities cannot obtain duplicate discounts or rebates – they cannot obtain Medicaid rebates for drugs that they purchase at a 340B discount. *Id.* § 256b(a)(5)(A)(i).

Finally, the 340B Program includes compliance and enforcement mechanisms for pricing violations. HHS enforces drug manufacturers' duty to sell discounted drugs and Covered Entities' duties not to seek improper discounts or make improper resales. *See id.* § 256b(d). Notably, all three components of the 340B Program speak to price.

When pricing, diversion, or discount disputes arise between manufacturers and Covered Entities, parties must go through HHS's dispute resolution process to resolve the issue. 42 U.S.C. § 256b(d)(3). To use the dispute resolution process, manufacturers must first audit a Covered Entity, which federal law allows them to do. *Id.* § 256b(a)(5)(C). And to conduct an audit, a manufacturer only needs to show "reasonable cause" that a Covered Entity may have violated a requirement of Section 340B. 61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996). HHS clarified that "reasonable cause" can be established without conditioning delivery of drugs on the provision of data, such as by showing "[s]ignificant changes in quantities of specific drugs

ordered by a Covered Entity and complaints from patients/other manufacturers about activities of a covered entity." *Id.* The Secretary of HHS is also authorized to audit Covered Entities. 42 U.S.C. § 256b(a)(5)(C).

Drug manufacturers and Covered Entities that fail to comply "can be fined, and covered entities can be kicked out of the program." *Sanofi Aventis v. United States Dep't of Health & Hum. Servs.,* 58 F.4th 696, 700 (3d Cir. 2023). Congress thus created a compliance and enforcement "framework . . . for . . . violations of the discounted pricing requirements," *Astra,* 563 U.S. at 122 (cleaned up), but omitted delivery methods out of that system.

While the text of Section 340B covers matters such as pricing, the 340B Program "is silent about delivery" and distribution of pharmaceuticals to patients. *Sanofi Aventis,* 58 F.4th at 703. Section 340B does not mention pharmacies nor the delivery of drugs by pharmacies to patients. Yet pharmacies are essential, and legally required, as part of the drug distribution chain. Thus, pharmacies have always been important participants in delivering 340B drugs to patients.

### 3.    HRSA recognizes that a Covered Entity using multiple contract pharmacies helps fulfill the 340B Program's aims

Although some Covered Entities have in-house pharmacies, many do not. Since the 1990s, Covered Entities have contracted with outside pharmacies to handle the acquisition, distribution, and dispensation of 340B drugs. The Health Resources and Services Administration, ("HRSA"), which is a unit of HHS that superintends the 340B Program, observed that most Covered Entities relied on contract pharmacies, while only four percent of such entities used in-house pharmacies. Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996) (hereinafter "1996 Guidance").

8

HRSA issued guidance in 1996, stating that a Covered Entity may use a contract pharmacy. HRSA's August 1996 Guidance "acknowledged that section 340B 'is silent as to permissible drug distribution systems.'" *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456-57 (D.C. Cir. 2024) (quoting 1996 Guidance at 43,549-50). The 1996 Guidance further recognized that Section 340B does not require a Covered Entity "dispense drugs itself." 1996 Guidance at 43,549-50. Therefore, "[i]t is clear that Congress envisioned that various types of drug delivery systems would be used to meet the needs of the very diversified group of 340B covered entities." *Id.*

"Covered entities using contract pharmacies . . . still order and pay for the drugs, but they [are] shipped directly to the pharmacies." *Sanofi Aventis*, 58 F.4th at 700. Covered Entities maintain legal title to the 340B drugs. 1996 Guidance at 43,552. HRSA's 1996 Guidance required that, "in directing shipments to its contract pharmacy," the Covered Entity "must retain title to the drugs and thus 'be responsible' for any diversion or duplicate discounts." *Novartis*, 102 F.4th at 456-57 (citing 1996 Guidance at 43,553). Accordingly, a Covered Entity's use of a contract pharmacy "does not in any way extend this pricing to entities which do not meet program eligibility." 1996 Guidance at 43,550. Instead, the pharmacy is authorized to "dispense 340B drugs to patients of the covered entity pursuant to a prescription." *Id.*

In 2010, HRSA expressly endorsed Covered Entities' use of multiple contract pharmacies. HRSA's 2010 Guidance stated that "covered entities may contract with an unlimited number of outside pharmacies and may do so regardless of whether the entities have in-house pharmacies." *Novartis*, 102 F.4th at 457 (citing Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,272-73 (Mar. 5, 2010) (hereinafter, "2010 Guidance")).

HRSA noted that without an option for Covered Entities to use multiple contract pharmacies, patients "face transportation barriers or other obstacles that limit their ability to fill their prescriptions." 2010 Guidance at 10,273. "It would be a significant benefit to patients to allow the use of more easily accessible, multiple contract pharmacy arrangements by covered entities." *Id.* Multiple contract pharmacies would "create wider patient access by having more inclusive arrangements in their communities which would benefit covered entities, pharmacies and patients." *Id.* The experience of Utah's Health Care providers supports the HRSA guidance.[10] In its 2010 Guidance, HRSA did not change its view that covered entities "must maintain title to and responsibility for the drugs." *Novartis,* 102 F.4th at 457 (citing 2010 Guidance at 10,277).

### 4.    Drug manufacturers implement policies that prevent Covered Entities from serving patients in need

Even though multiple contract pharmacies benefit patients, large drug companies want to put a stop to the practice.  They would like to dictate and limit how public, critical access, and rural hospitals provide care to their diverse patients. In 2020, "drug manufacturers began implementing distribution policies that limited or prohibited Covered Entities from contracting with outside pharmacies for the dispensation of 340B drugs to patients." *McClain,* 95 F.4th at 1139.  For example, Amgen, a member of PhRMA, allows Covered Entities to use only one contract-pharmacy that must be within 40 miles of the entity.[11] (Yet most Covered Entities in Utah serve an area with a radius far larger than 40 miles.[12]) Policies like this "caused Covered

---

[10] *See, e.g.*, Declaration of Alicia Martinez, Chief Executive Officer of Midtown Community Health Center ("Martinez Dec."), attached hereto as Exhibit 7, paragraph 7 ("Midtown previously held pharmacy contracts [prior to recent restrictions imposed by drug manufacturers] in Salt Lake City, to ensure patients served through this location could also access affordable medication [in addition to patients located closer to Midtown's clinics]").

[11] Decl. of Patrick Costello, Ex. 2 to Pl.'s Mot. for Preliminary Injunction, ECF No. 17-2 ¶ 13.

[12] *See, e.g.*, Horrocks Dec., Exhibit 1, paragraph 3 and Park Dec., Exhibit 3, paragraph 3 (U of U Health cares for "patients in Utah, Idaho, Wyoming, Montana, western Colorado, and much of

Entities dependent on contract pharmacies to become unable to serve patients in need."

*McClain*, 95 F.4th at 1139.[13]

In order to protect wider patient access to drugs, states began to enact legislation to address the delivery gap left open by federal law. Arkansas was the first, enacting legislation in 2021 that "prohibits manufacturers from limiting covered entities' ability to contract with outside pharmacies." *Id.* Kansas, Louisiana, Maryland, Minnesota, Mississippi, Missouri, and West Virginia quickly did the same.

Drug manufacturers have challenged almost all of these state laws, claiming that these laws are unconstitutional. All but one court have found that these claims, including preemption claims, have no merit. For example, in *McClain*, the Eighth Circuit affirmed summary judgment against PhRMA's claims. 95 F.4th at 1140. Because "the text of 340B is silent about delivery," "the 340B program is not so pervasive … that Congress left no room for the States to supplement it." *Id.* at 1143 (cleaned up). Arkansas' law was therefore not preempted. *Id.*

Elsewhere, the U.S. District Court for the Western District of Louisiana also granted summary judgment against PhRMA on all claims. *PhRMA v. Murrill*, No. 6:23-cv-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024). The Western District of Missouri dismissed preemption

---

Nevada – a catchment area that comprises more than ten percent of the continental United States (over 350,000 square miles and includes several frontier and rural communities, such as the Navajo Nation"); *see also* the Declaration of Todd Bailey, Executive Director of Mountainlands Community Health Center ("Bailey Dec."), attached hereto as Exhibit 8, paragraph 7 (Mountainlands "need[s] contract pharmacies to serve patients in clinics located far away from our in-house pharmacy").

[13] *See, e.g.*, Declaration of Lorraine Wright, Chief Executive Officer of Southwest Utah Community Health Center ("Wright Dec."), attached hereto as Exhibit 9, paragraph 11 ("Restrictions imposed by drug manufacturers that required Southwest Utah Community Health Center, Inc. to use only one contract pharmacy have prevented patients from having access to necessary medications at a discounted price").

claims at the pleading stage. *Novartis Pharms. v. Bailey*, No. 2:24-cv-04131-MDH, 2025 WL 489881 (W.D. Mo. Feb. 13, 2025). The District of Maryland denied a preliminary injunction. Order Den. Pl.'s Mots. Prelim. Inj., *Novartis Pharms.*, No. 1:24-cv-01557 (D. Md. Sept. 5, 2024), ECF No. 57. And the Southern District of Mississippi has denied four separate motions for preliminary injunction. *Novartis Pharms. v. Fitch*, 738 F. Supp. 3d 737, 744 (S.D. Miss. 2024); *PhRMA v. Fitch*, No. 1:24-CV-160-HSO-BWR, 2024 WL 3277365 (S.D. Miss. July 1, 2024); *AbbVie Inc. v. Fitch*, No. 1:24-CV-184-HSO-BWR, 2024 WL 3503965 (S.D. Miss. July 22, 2024); *AstraZeneca v. Fitch*, No. 1:24CV196-LG-BWR, 2024 WL 5345507 (S.D. Miss. Dec. 23, 2024). [14]

**5.    Utah's Law**

In 2025, Utah joined the growing national movement to preserve patient access to 340B drugs by enacting Senate Bill 69, codified at Utah Code § 31A-46-311. SB69 received enormous bipartisan support in the Utah Legislature, passing the house unanimously[15] and receiving just one nay vote in the senate.[16]

SB69 prohibits manufacturers from restricting or prohibiting 340B drugs from being sent to locations authorized by Covered Entities. Utah Code § 31A-46-311(2)(a)(iii). This provision prohibits manufacturers from conditioning their 340B drug sales on a Covered Entity's agreement to use only one contract pharmacy.

SB69 further prohibits manufacturers from requiring Covered Entities to submit claims data, utilization data, or information about its contracts as a condition of the manufacturer's

---

[14] Only the Southern District of West Virginia has granted a preliminary injunction. *PhRMA v. Morrisey*, 760 F. Supp. 3d 439 (S.D.W. Va. 2024). As explained elsewhere, the court in *Morrisey* misapplied precedent.

[15] https://le.utah.gov/DynaBill/svotes.jsp?sessionid=2025GS&voteid=1210&house=H

[16] https://le.utah.gov/DynaBill/svotes.jsp?sessionid=2025GS&voteid=1613&house=S

340B drug offer to that entity. *Id.* § 31A(2)(b)(ii). The Utah Legislature ensured that this provision would not conflict with Section 340B. *Id.* ("unless the data or information sharing is required by federal law.").

SB69 is administered and enforced by the Utah Insurance Commissioner, because SB69 is codified in the Insurance Code. Utah Code § 31A-2-201(1) ("The commissioner shall administer and enforce this title."); § 31A-46-311. SB69 limits enforcement for violations of just SB69 itself; SB69 does not authorize the Insurance Commissioner to enforce purported violations of the 340B Program. *Id.* § 31A-46-401. The Insurance Commissioner may order a money sanctions to a person who violates SB69 for "not more than $5,000 for each violation" of SB69. *Id.* § 31A-2-308(1)(b)(ii). On preemption, SB69 instructs that "[n]othing in this section is to be construed to conflict with federal law." Utah Code § 31A-46-311.

## LEGAL STANDARD

PhRMA asks this Court to take the "extraordinary" and "drastic" action of preliminarily enjoining the State from enforcing a duly enacted law that protects patient access to drugs. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). To obtain a preliminary injunction, PhRMA has the heavy burden to establish that its right to relief is "clear and unequivocal," and must establish all four preliminary injunction factors. *Heideman v. So. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). "[E]specially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative." *Eccles v. Peoples Bank of Lakewood Village, Cal.*, 333 U.S. 426, 431 (1948). This is because "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012).

To the extent that preserving the status quo is a consideration in a motion for preliminary injunction, the relevant status quo is "the last *peaceable uncontested* status existing between the parties before the dispute developed." *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1260 (10th Cir. 2005) (emphasis added). This dispute developed when drug manufacturers imposed unilateral requirement and initiated litigation regarding contract pharmacies in 2020.  But for decades prior, Covered Entities used multiple contract pharmacies. Since the 1990s, about 96% of Covered Entities were relying on contract pharmacies. 1996 Guidance at 43,550. And the status quo was furthered governed by HRSA's 2010 Guidance, which expressly endorsed covered entities' use of multiple contract pharmacies. Recent policies by PhRMA's members altered that decades-long status quo. Bristol Myers Squibb, a PhRMA member, only introduced its contract pharmacy policy on March 1, 2022.[17]  SB 69 seeks to restore the status quo that existed for decades.

## ARGUMENT

**1.    PhRMA doesn't meet its burden to demonstrate a substantial likelihood of success on the merits of its preemption claims**

Defendants have simultaneously filed a Motion to Dismiss the Complaint for failure to state claims upon which relief may be granted. *See* ECF No. 28. Defendants incorporate those arguments by reference. For the same reasons PhRMA's Complaint is subject to dismissal pursuant to Rule 12(b)(6), PhRMA has not and cannot meet its burden to show that it is substantially likely to prevail on the merits of its claims.[18] And even if the Court were inclined to deny Defendants' Motion to Dismiss under the Rule 12(b)(6) standard (which it should not be),

---

[17] Decl. of Justin McCarthy, Ex. 2 to Pl.'s Mot. for Preliminary Injunction, ECF No. 17-3, ¶ 10.
[18] PhRMA only argued a substantial likelihood of success on its preemption claims, and did not raise its Commerce Clause or vagueness claims in its Motion.

the burden in the context of a Motion for Preliminary Injunction belongs to PhRMA and is a heavy one; the Court could and should deny the Motion for Preliminary Injunction because PhRMA cannot show that it is substantially likely to succeed on the merits or that its right to relief is clear and unequivocal.

**2.    PhRMA will not suffer irreparable harm from SB69**

As another reason to deny the Motion for Preliminary Injunction, PhRMA fails to show irreparable harm. "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman*, 348 F.3d at 1189 (cleaned up). Moreover, PhRMA "must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (cleaned up). None of PhRMA's arguments shows a certain, actual, and imminent injury.

PhRMA first alleges that if its members comply with SB69, it will cost manufacturers millions in discounts not required under 340B. This contention has no merit. SB69 does not require PhRMA's members to provide discounted prices beyond what Section 340B does. PhRMA further alleges that it will expend "time and financial resources" analyzing SB69.[19] This vague and conclusory allegation is insufficient to establish irreparable harm. PhRMA does not provide specific factual detail, as required by Rule 65, demonstrating imminent irreparable harm it will suffer from SB69.

Finally, PhRMA alleges it will divert resources from research and development. The District of Utah has already concluded that this exact argument is insufficient to demonstrate

---

[19] Pl.'s Mot. for Preliminary Injunction, ECF No. 17, at 23.

irreparable harm. In *Alcon Lab'ys, Inc. v. Reyes*, contact lens manufacturers claimed that a Utah law violated the Commerce Clause, and sought a preliminary injunction.  No. 2:15CV252-DB, 2015 WL 9236136, at *1 (D. Utah May 11, 2015), aff'd sub nom. 665 F. App'x 736 (10th Cir. 2016). The plaintiffs alleged economic injuries such as financial loss and a diminishment in the plaintiffs' "incentives and ability to invest in research and development." *Id.* at *8.

The District of Utah flatly rejected this argument: "These injuries, like Plaintiffs' claimed constitutional injuries, rely on Plaintiffs' speculation, both as to the monetary amounts of such injuries, and how [the statute] will be enforced. Such hypothetical injuries are insufficient to constitute irreparable harm." *Id.* The district court concluded that the plaintiffs failed to meet their burden of establishing irreparable harm.

PhRMA's assertions here suffer from the same infirmities. The Court should deny PhRMA's Motion.

### 3. The balance of equities and public interest weigh against granting a preliminary injunction

The balance of the equities and the public interest factors merge when the government is party opposing a preliminary injunction. *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024). These factors favor the State because Utahns will suffer significant harm if the Court grants the preliminary injunction relief sought by PhRMA. Patients in Utah rely on pharmacies to provide them with necessary medications. SB69 restores wider geographic access to 340B drugs. PhRMA seeks to limit nonprofit and rural hospitals' ability to benefit from the 340B Program. This harms the public.

Attached to this Memorandum are ten declarations representing many Covered Entity healthcare providers in the State of Utah, all attesting to the public interests served by having

multiple contract pharmacies as part of the 340B program, and to the damage that has occurred in the absence of SB69, and that will continue to occur, and worsen, if SB69 is enjoined.

(1) Health West, Inc., a FQHC, has patients who live over a wide physical area, rendering frequent visits to Health West pharmacies untenable. For this reason, it had contracts with eight pharmacies in the State of Utah. The discounts Health West receives through the 340B program are essential for it to continue to provide care for the patients it serves. Restrictions imposed by drug manufacturers that prevented Health West from using a contract pharmacy have prevented patients from having access to necessary medications at discounted prices. Further, Health West has experienced an annual decline in its contract pharmacy 340B-associated revenues since 2020 when drug manufacturers began to impose restrictions on the use of contract pharmacies. Health West has lost a substantial amount of revenue since 2020 due to the drug manufacturer restrictions on contract pharmacies, and anticipates further declines, which adversely impacts Health West's ability to provide services to its patients. *See* Horrocks Dec., Exhibit 1, paragraphs 4-12;

(2) San Juan Health Services District ("SJHSD") operates a Critical Access Hospital in Monticello, Utah as wells as three Rural Health Clinics in Monticello, Blanding, and Spanish Valley, Utah. For many years, SJHSD has contracted with independent, local pharmacies in San Juan County to ensure patients across its remote and rural service area can access medications within a reasonable distance of their homes. Drug manufacturer restrictions on the use of contract pharmacies have significantly limited SJHSD's ability to access 340B savings, resulting in a meaningful decline in saving, up to 20% in 2024, which has directly affected its ability to maintain and expand critical health programs and services. 340B savings had enabled SJHSD to establish and subsidize a much-needed Oncology Services Program to provide oncology care,

17

and the implementation of chemotherapy and hazardous drug administration services. Without these services, many patients in the service district would face round-trip travel of up to ten hours for cancer care. For some, this barrier has resulted in missed or abandoned treatment altogether. Lost savings through the 340B program have directly impacted SJHSD's ability to operate and expand patient services. *See* Holt Dec., Exhibit 6, paragraphs 4-10;

(3) Mountainlands Community Health Center ("Mountainlands") is a FQHC that serves patients primarily living in Utah and Uintah counties. Its needs contract pharmacies to serve patients in clinics located far away from its in-house pharmacy. Restrictions imposed by drug manufacturers that Mountainlands use only one contract pharmacy have prevented patients from having access to necessary medications at a discounted price. When that happens, Mountainlands staff must try to identify similar medications that could be available at a reasonable price or try to get the patient on an assistance program. This requires Mountainlands staff to use significant time and resources that would otherwise be used for direct patient care. *See* Bailey Dec., Exhibit 8, paragraphs 3-12;

(4) Southwest Utah Community Health Center ("Southwest") is FQHC serving patients in Washington and Iron Counties with clinics in St. George, Hurricane, and Cedar City. Southwest has nine contract pharmacy locations to serve its patients because Southwest wants all patients it serves, almost 90% of whom are below 200% of the federal poverty limit, to have equal access to the discounted pricing that 340B provides, regardless of their address. Further, the discounts that Southwest receives through the 340B program are essential for it to continue to provide care to the patients it serves. In addition to staff time and resources costs imposed by drug manufacturer restrictions on contract pharmacies, Southwest has experienced an annual decline in its 340B0-associated revenue since 2020. Between 2020 and 2024, its pharmacy

operations experienced a significant decline in financial performance: average revenue per script fell 79% and average net profit per script dropped 95%. In the first quarter of 2025, this trend culminated in a net loss of $17,284.88, marking a concerning shift from positive margins to operating losses. *See* Wright Dec., Exhibit 9, paragraphs 3-12;

(5) Midtown Community Health Center ("Midtown") is a FQHC serving patients in Ogden, Roy, Clearfield, Washington Terrace, Salt Lake, South Salt Lake, and surrounding areas from Weber, Davis, and Salt Lake Counties. Midtown operates six sites located in Ogden, Washington Terrace, South Salt Lake, and Clearfield, Utah. One of the Ogden locations is collocated with the area's largest homeless shelter, offering comprehensive primary care, behavioral health, dental and pharmacy services to individuals experiencing homelessness. Midtown also operates a pediatric practice, serving the area's low income, uninsured, and underinsured pediatric population. Midtown has no current contract pharmacy agreements in place. However, past contract agreements have allowed patients to be served through geographically separated sites, such as Logan and Salt Lake City. The discounts Midtown receives are essential for it to continue to provide care to the patients it serves. The difference Midtown receives between insurers' prescription reimbursements and drug manufacturers 240B discount prices is income that Midtown uses to continue its operations. Restrictions imposed by drug manufacturers on the use of contract pharmacies has required Midtown staff to use significant time and resources that would otherwise be used for direct patient care. *See* Martinez Dec., Exhibit 7, paragraphs 2-10;

(6) Community Health Centers ("CHC") is a FQHC serving patients in Salt Lake and Box Elder Counties. Over 90% of its patients are below 200% of the federal poverty limit and 44% of its patients are below 100% of the federal poverty limit. CHC has contracts with Kroger

(Smiths) and Walgreens pharmacy locations to serve its patients and does not currently have an in-house pharmacy. As with other FQHCs, the difference CHC receives between insurers' reimbursements and drug manufacturers' 340B discount prices is income that CHC uses to continue its operations. Restrictions imposed by drug manufacturers on contract pharmacies have prevented patients from having access to necessary medications at a discounted price, and have imposed time and resources obligations on CHC staff that would otherwise be used for direct patient care. Further, CHC has experienced annual decline in 340B-associated revenue since 2020. Prior to 2020, is 340B-associated revenue was approximately $1.5M. After CHC became restricted by drug manufacturers in the use of contract pharmacies, this 340B revenue declined to a loss - $1.1 million annually because CHC became required to pay full price for otherwise 340B-eligible medications. CHC anticipates continuing decline. In 2024, CHC had to lay off 24% of its staff in large part due to the 340B program. *See* Thomas Dec., Exhibit 5, paragraphs 3-13;

(7) The Association for Utah Community Health ("AUCH") is a non-profit membership organization comprised of 14 FQHCs, 12 of which are incorporated in Utah and one each incorporated in Idaho and Arizona, serving Utah patients. Some of Utah's FQHCs have contracted with outside pharmacies for two reasons: (1) the FQHC does not have the finances to open its own pharmacy; or (2) the FQHC has one or more in-house pharmacies but needs to contract with outside pharmacies to provide access to patients who live far away from the in-house pharmacies. Because Utah's FQHC's serve some of the most vulnerable communities and operate on thin financial margins, they need their 340B-associated revenue to maintain their operations. The protections offered by SB69 would remedy some of the damage Utah's FQHCs are experiencing because of the contract pharmacy restrictions and prevent future harm. *See* Pruhs Dec., Exhibit 4, paragraphs 3-15;

20

(8) Intermountain Health operates fourteen 340B-qualified Covered Entities in Utah. These non-profit, safety-net hospitals and federal grantees provide healthcare and critical services to low-income and vulnerable populations, regardless of ability to pay. The limitations on delivery and distribution of 340B covered drugs imposed by manufacturers has significant consequences for IH Covered Entities and its patients. Not every pharmacy carries every drug. Some high-cost drugs are only available through specialty pharmacies, which typically ship the patients' drugs by mail. By requiring IH to choose a single contract pharmacy for its entities, manufacturers force IH into trade-offs. If IH chooses a local corner-store pharmacy, then it does not serve patients who need specialty drugs or who lack reliable transportation. If IH chooses a mail-order pharmacy, it does not serve patients who lack stable housing or simply may not be home to accept delivery if a signature is required. If IH chooses a specialty pharmacy, it will not serve patients prescribed less costly, easier-to-administer medications. IH uses 340B savings to support a range of services aligned with the program's intent to stretch scarce federal resources as far as possible, reaching more eligible patients and providing more comprehensive services. These include uncompensated and charity care, financial assistance, medication copay assistance, care navigation services. and ambulatory pharmacy services. *See* Forbush Dec., Exhibit 2, paragraphs 4-20.

(9) U of U Health is a safety-net health care provider and is committed to caring for patients regardless of their ability to pay. Like other Covered Entities participating in the 340B program, U of U Health does not receive enough reimbursement to cover the cost of the care it provides, which it frequently provides without reimbursement. In 2024 alone, U of U Health provided over $190 million in uncompensated care and bad debt. U of U Health uses the savings

generated through the 340B program to support this care. U of U Health also uses 340B savings for a variety of other services such as providing medications free of charge to eligible low-income patients, connecting patients with resources that provide grants, and free or discounted medications, subsidizing health services that operate at a loss, subsidizing behavioral health programs that operate at a loss, providing free or discounted services to the public, investing in telehealth and education programs, and providing certified translators. U of U Health serves a large geographic area with vulnerable populations who frequently do not have easy access to its in-house pharmacies. Contract pharmacies help ensure all patients – especially those in rural or medically underserved areas – can obtain medication at accessible locations. U of U Health is committed to ensuring the integrity of the 340B program and has robust policies and procedures in place to ensure contract pharmacies comply with 340B program requirements, including dispensing medications purchased at a discount under the 340B program only to authorized patients. U of U Health routinely audits its contract pharmacies using an independent audit firm. U of U Health has successfully undergone multiple audits itself, including a HRSA audit, with no contract pharmacy noncompliance findings. As a direct result of drug manufacturers' restrictions on contract pharmacy arrangements, U of U Health has experienced a drastic reduction in 340B savings of approximately $70 million dollars. The consequences of losing these 340B savings are extensive and ongoing, compromising U of U Health's ability to continue, among other things, providing health care services that operate at a loss, expanding the healthcare workforce to support demand in a growing state, and expanding health care facilities. Without SB69, drug manufacturers will almost certainly continue to reduce U of U Health's 340B savings, and compromise its ability to provide comprehensive healthcare services to its patients.[20]

---

[20] *See* Park Dec., Exhibit 3, paragraphs 3-17.

(10)    Uintah Basin Medical Center (UBMC) is a non-profit health system serving patients primarily in eastern Utah. It is a Covered Entity, contracting with independent pharmacies in Uintah and Duchesne Counties to ensure its patients across is remote and rural service area can access medications within a reasonable distance of their home. Through the savings generated by the 340B program, UBMC is able to offer critical services such as Cancer Care & Infusion, Dialysis and other essential services for vulnerable populations, including Native American communities. Without 340B, UBMC would need to cut 20% of its current medication administration. The 340B program is an essential tool in fulfilling UBMC's mission of providing access to compassionate quality healthcare. See Declaration of Jim Marshall, President and CEO of UBMC ("Marshall Dec."), attached hereto as Exhibit 10, paragraphs 2-10.

Compare these documented harms to Utah's populace resulting from a loss of 340B savings with PhRMA's vague assertion that "most patients receive no drug price reductions on drug purchased at the 340B price."[21] PhRMA puts forth no specific evidence that Utah patients are not benefitting from 340B discounts, nor does PhRMA provide any evidence of how Covered Entities in Utah use the difference between insurers' reimbursements of 340B drugs and the discounted price to expand healthcare coverage. Rather, PhRMA vaguely suggests that non-profit Covered Entity providers are taking the difference.[22] Such facile assertions fall far short of the standard for issuing the drastic remedy of a preliminary injunction.

Utah's ability "to enact and enforce measures it deems to be in the public interest is still an equity to be considered in the balance of hardships." Heideman, 348 F.3d at 1191. "Entering an injunction in this case would prevent enforcement of a law that the Utah Legislature

---

[21] Pl.'s Mot. for Prelim. Inj., ECF No. 17, p. 2.
[22] Id.

determined was necessary to protect" patients of public and not-for-profit hospitals, community centers, and clinics that that provide medical care for the poor. *Alcon Lab'ys*, 2015 WL 9236136, at *9. When a "State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012). This injury is also part of the balancing of the harms analysis.

**CONCLUSION**

Cooperative federalism recognizes overlapping functions of the national and state governments. The Supreme Court has said that when interpreting "statutes so structured, [courts should] not be reluctant to leave a range of permissible choices to the States, at least where the superintending federal agency has concluded that such latitude is consistent with the statute's aims." *Wisconsin Dept. of Health and Family Services v. Blumer*, 534 U.S. 473, 495 (2002). Here, SB69 (prohibiting drug manufacturers from preventing Covered Entities from using multiple contract pharmacies) is consistent with 340B's aims, to expand healthcare coverage as widely and as comprehensively as possible. There is no field or conflict preemption. Further, the public interest would be clearly injured through enjoinment of SB69. Some Covered Entities may no longer be able to operate and serve uninsured patients. Healthcare coverage, especially for Utah's rural areas, may very well contract. The Court should deny PhRMA's Motion for Preliminary Injunction for any, or all, of these reasons.

DATED: May 16, 2025.

OFFICE OF THE UTAH ATTORNEY GENERAL

*/s/ Lance Sorenson*
JASON DUPREE
LANCE SORENSON
Assistant Utah Attorneys General
*Counsel for Defendants*