Peter C. Schofield (Utah Bar #9447)
Allen M. Gardner (Utah Bar #7530)
Christopher Sanders (Utah Bar #16939)
**KIRTON MCCONKIE**
Thanksgiving Park Four
2600 West Executive Parkway, Suite 400
Lehi, Utah 84043
Telephone: (801) 426-2100
Facsimile: (801) 426-2101
pschofield@kmclaw.com
agardner@kmclaw.com
csanders@kmclaw.com

Philip J. Perry (*pro hac vice*)
Andrew D. Prins (*pro hac vice*)
Abid R. Qureshi (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
philip.perry@lw.com
andrew.prins@lw.com
abid.qureshi@lw.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| **PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,**<br><br>***Plaintiff,***<br><br>**v.**<br><br>**JON PIKE, in his official capacity as Commissioner of the Utah Insurance Department and DEREK BROWN, in his official capacity as Attorney General of Utah,**<br><br>***Defendants.*** | **No. 2:25-cv-00308-RJS-DAO**<br><br>**Judge Robert J. Shelby**<br><br>**Magistrate Judge Daphne A. Oberg** |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................3

A. The Federal 340B Drug Pricing Program ....................................................3

1. Congress Established 340B's Structure And Purpose ................................3

2. Contract Pharmacies Barge Into 340B....................................................4

3. Manufacturers Attempt To Curb Abuse ..................................................6

B. Utah Senate Bill 69 ....................................................................................7

C. Procedural History ....................................................................................8

ARGUMENT ........................................................................................................8

I. PhRMA Has Sufficiently Pled Its Preemption Claim......................................9

A. Claim I States A Preemption Claim..........................................................9

B. The State's Counterarguments Fail..........................................................12

1. There Is No Gap For Utah To Fill ........................................................12

2. *McClain* Is Inapposite ......................................................................15

3. S.B. 69 Does Not Benefit From A Presumption Against Preemption ......................................................................16

II. PhRMA Has Sufficiently Pled Its Commerce Clause Claim..........................17

III. PhRMA Has Sufficiently Pled Its Due Process Claim ...............................19

CONCLUSION....................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arizona v. United States*,
567 U.S. 387 (2012) ....................9, 12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................8

*Ass'n for Accessible Meds. v. Ellison*,
2025 WL 1660112 (8th Cir. June 12, 2025) ....................18

*Ass'n for Accessible Meds. v. Frosh*,
887 F.3d 664 (4th Cir. 2018) ....................19

*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110 (2011) .................... *passim*

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988) ....................16

*Buckman v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) ....................10

*Carolina Youth Action Project v. Wilson*,
60 F.4th 770 (4th Cir. 2023) ....................20

*Corp. of Haverford Coll. v. Reeher*,
329 F. Supp. 1196 (E.D. Pa. 1971) ....................20

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ....................9

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ....................19

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000) ....................9

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ....................19

*Helfrich v. Blue Cross & Blue Shield Ass'n*,
804 F.3d 1090 (10th Cir. 2015) ....................16

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987)....................9, 10

*Jordan-Arapahoe, LLP v. Bd. of Cty. Comm'rs*,
633 F.3d 1022 (10th Cir. 2011) ....................8

*Mother Zion Tenant Ass'n v. Donovan*,
55 A.D.3d 333 (N.Y. App. Div. 2008) ....................15

*National Pork Producers Council v. Ross*,
598 U.S. 356 (2023)....................18

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024).................... *passim*

*Pharm. Rsch. & Mfrs. of Am. v. Bailey*,
2025 WL 644281 (W.D. Mo. Feb. 27, 2025) ....................19

*Pharm. Rsch. & Mfrs. of Am. v. Morrisey*,
760 F. Supp. 3d 439 (S.D. W. Va. 2024).................... *passim*

*Pharm. Rsch. & Mfrs. of Am. v. McClain*,
95 F.4th 1136 (8th Cir.) ....................15, 16

*Polselli v. IRS*,
598 U.S. 432 (2023)....................14

*San Diego Bldg. Trades Council, Millmen's Union v. Garmon*,
359 U.S. 236 (1959)....................12

*Sanofi Aventis U.S. LLC v. HHS*,
58 F.4th 696 (3d Cir. 2023) .................... *passim*

*Sessions v. Dimaya*,
584 U.S. 148 (2018)....................19

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003)....................18

*Styczinski v Arnold*,
46 F.4th 907 (8th Cir. 2022) ....................18

*Teltech Systems, Inc. v. Bryant*,
702 F.3d 232 (5th Cir. 2012) ....................14

*United States v. Alabama*,
691 F.3d 1269 (11th Cir. 2012) ....................17

*United States v. Elliot*,
2018 WL 11478272 (N.D. Ga. Aug. 8, 2018) ....................20

*US Airways, Inc. v. O'Donnell*,
627 F.3d 1318 (10th Cir. 2010) ....................16

*Vill. Of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982)....................19

*Winters v. New York*,
333 U.S. 507 (1948)....................19

*Wis. Dep't of Indus., Lab. & Human Rels. v. Gould Inc.*,
475 U.S. 282 (1986)....................12

*Wos v. E.M.A. ex rel. Johnson*,
568 U.S. 627 (2013)....................12, 17

*Wyo. Gun Owners v. Gray*,
83 F.4th 1224 (10th Cir. 2023) ....................19

**STATUTES**

38 U.S.C. § 8126....................14

42 U.S.C.
§ 256b.................... *passim*
§ 256b(a)(1) ....................3, 17
§ 256b(a)(4) ....................3
§ 256b(d)(1) ....................4, 11, 12

Utah Code
§ 31A-46-102(1) ....................7, 17
§ 31A-46-102(2) ....................7
§ 31A-46-311(a)....................18
§ 31A-46-311(b) ....................18, 20
§ 31A-46-311(c)....................20

**REGULATIONS**

42 C.F.R. § 1003.1500(a)....................4

61 Fed. Reg. 43,549 (Aug. 23, 1996)....................4, 5

75 Fed. Reg. 10,272 (Mar. 5, 2010)....................4

89 Fed. Reg. 28,643 (Apr. 19, 2024) ....................11

## CONSTITUTIONAL PROVISIONS

U.S. Const., Article VI, cl. 2 ........................................................................................................9

U.S. Const. Amendment XIV, § 1 ...................................................................................19

## INTRODUCTION

Plaintiff Pharmaceutical Research and Manufacturers of America's ("PhRMA") Complaint easily withstands the State's legal challenge. The state law at the heart of the Complaint, Senate Bill 69 ("S.B. 69")—which adds *state law* requirements onto a *federal* drug pricing program—is preempted by federal law, unconstitutionally regulates extraterritorial conduct, and is unconstitutionally vague.

PhRMA's Complaint effectively and sufficiently asserts a preemption claim. The pleading explains that the federal 340B Drug Pricing Program, 42 U.S.C. § 256b ("340B"), is a unique form of privately-funded federal subsidy, subject to specific bounds established solely by Congress and administered exclusively by the federal government. *See* Compl. ¶¶ 119-36; PhRMA Prelim. Inj. Relief Br. at 12-20; PhRMA Prelim. Inj. Reply at 2-14. And, as the Complaint adequately pleads, S.B. 69 is about pricing, not delivery, and all of the same drugs remain accessible to the same pharmacies, just at commercial prices. Compl. ¶¶ 20-21, 67-70, 73-74. The State concedes (at MTD 12) that Congress created an exclusive federal field in 340B: "the field of drug discount *pricing*." This (accurate) concession makes resolution of this case and motion straightforward. *See* PhRMA Prelim. Inj. Reply at 2-3, 11. Utah cannot ignore Congress's chosen method for implementing 340B and the balance struck by Congress by imposing its own preferred terms for 340B participation. Nor can it usurp the federal government's exclusive enforcement authority. *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 120-22 (2011). S.B. 69 is preempted.

All of the State's contrary arguments fail. Utah centrally argues that S.B. 69 is not preempted because it regulates drug delivery, while 340B regulates drug pricing. But that semantic sleight of hand is simply incorrect, disregarding 340B's text, S.B. 69's text, how 340B operates, and the State's own statements regarding its law. PhRMA Prelim. Inj. Reply at 3-8, 11; *infra* at

12-15. As a court recently explained when holding a similar state law preempted, "[p]rice is what distinguishes between an 'ordinary drug' and a 340B Program drug." *Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 455 (S.D. W. Va. 2024). As that court concluded, "the question is not about delivery of the drug. The question is only about what price the pharmacy and the covered entity will pay[.]" *Id.* Thus, laws like S.B. 69 are "about delivery *at a given price*, not delivery *per se*." *Id.* Just like the state law enjoined in *Morrisey*, S.B. 69 governs price, and because Utah concedes 340B drug pricing is a federal field, S.B. 69 is preempted even under Utah's own theory.

In any event, whether S.B. 69 is termed a pricing or delivery restriction, the State's position contradicts precedent establishing there is no "gap" in a program like 340B for Utah to fill. *See infra* at 12-15. 340B is a unique privately funded subsidy program that operates on an incentive basis. S.B. 69, regardless of the State's label, impermissibly skews the balance Congress struck and cannot stand.

PhRMA has also sufficiently pled that S.B. 69 unconstitutionally regulates extraterritorial conduct. S.B. 69 requires drug manufacturers to provide 340B-priced drugs to out-of-state pharmacies and directly governs out-of-state transactions, including by dictating that manufacturers enter into 340B transactions that they otherwise would not. Finally, PhRMA has sufficiently alleged that S.B. 69's bar on "interference" is unconstitutionally vague. The State offers no clear articulation of what conduct constitutes prohibited interference.

PhRMA respectfully requests the Court deny the State's motion to dismiss.

## BACKGROUND

### A. The Federal 340B Drug Pricing Program

#### 1. Congress Established 340B's Structure And Purpose

Generally, drug manufacturers must participate in 340B to have certain of their drugs reimbursed under Medicare Part B and the federal portion of Medicaid. Compl. ¶¶ 3-4. At the outset, Congress intended 340B's scope to be small, which kept 340B's incentive structure balanced. *Id.* ¶ 39. 340B is purely a creature of federal law that sets requirements for when manufacturers are required to offer their drugs at federally reduced prices. The statute first defines the federal obligation on drug manufacturers. It provides that manufacturers must "enter into an agreement" with the U.S. Department of Health and Human Services ("HHS") Secretary (the "Pharmaceutical Pricing Agreement" ("PPA")), and that such an agreement "shall require that the manufacturer *offer* each covered entity covered outpatient drugs for purchase" at or below a ceiling price. 42 U.S.C. § 256b(a)(1) (emphasis added); *see also Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456, 462 (D.C. Cir. 2024) (explaining that 340B "require[s] drug manufacturers to make an 'offer'" to covered entities); *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703 (3d Cir. 2023). The "offer" must be "bona fide," providing reasonable terms for delivery, consistent with 340B. *Novartis*, 102 F.4th at 463-64. Other than mandating that manufacturers make bona fide offers to covered entities at a specific price, federal law places no other constraints on the offer, leaving the rest of the terms to manufacturers. *Id.*

The federal statute next defines and expressly limits which specific entities are entitled to access 340B pricing: fifteen types of healthcare providers. 42 U.S.C. § 256b(a)(4). Even if they fall within one of those categories, covered entities can lose their eligibility if they engage in "diversion"—selling or transferring the drugs to anyone other than their patients—or duplicate discounting—seeking a rebate under Medicaid for a 340B-priced drug. *Id.* § 256b(a)(4), (5).

In 2010, Congress amended 340B to address questions about enforcement of 340B pricing obligations and disputes between drug manufacturers and covered entities. As the Supreme Court explained in *Astra*, Congress created an entirely federal scheme for enforcement as the "proper remedy." 563 U.S. at 120-22. In 42 U.S.C. § 256b(d)(1)(B)(vi), Congress instructed HHS to create a system of enforcement, including monetary sanctions on a manufacturer who "knowingly and intentionally" charges a covered entity more than the 340B price. Before imposing sanctions, HHS must serve written notice, 42 C.F.R. § 1003.1500(a), and provide advance warnings, *see* 42 U.S.C. §256b(d)(1)(B)(i)-(ii) (requiring HHS to establish procedures to resolve disputes amicably, including through dialogue with the agency). Congress also created a special administrative dispute resolution process ("ADR") to address disputes between manufacturers and covered entities. *Id.* § 256b(d)(3). Covered entities have invoked the federal ADR process on multiple occasions, claiming that it addresses the same issues S.B. 69 addresses. Compl. ¶ 100.

2. Contract Pharmacies Barge Into 340B

In 1996, the U.S. Health Resources and Services Administration ("HRSA"), a subcomponent agency of HHS, issued guidance allowing certain covered entities (those without their own in-house pharmacies to dispense 340B-priced drugs) to identify one "contract pharmacy" to receive and dispense 340B-priced drugs to patients of the covered entity. *See* 61 Fed. Reg. 43,549, 43,550, 43,555 (Aug. 23, 1996). HRSA's guidance provided criteria for the contractual arrangement, including verification at the time of dispensing that the patient to whom the prescription was dispensed had been treated at the covered entity. *Id.* at 43,551, 43,553-555. The one-contract-pharmacy limit practically ensured that a covered entity would choose a nearby pharmacy, set prices for the drugs dispensed, and closely supervise the process. *Id.*

In 2010, HRSA issued guidance lifting its one-pharmacy limit. 75 Fed. Reg. 10,272, 10,273 (Mar. 5, 2010). As the Government Accountability Office ("GAO") and the HHS Inspector

General ("OIG") explained, the floodgates opened. Even though Congress did not authorize them to participate in 340B, many sophisticated for-profit pharmacies—including the nation's largest chains—recognized that if they could insert themselves into 340B, they could sell 340B-priced drugs at or near full price and pocket a portion as profit for themselves, by receiving either a percentage of the sales price or a flat fee per prescription. *Novartis*, 102 F.4th at 456-58; *see also* Compl. ¶ 17.[1] Predictably, the number of for-profit pharmacies participating in 340B greatly increased, with contract pharmacy arrangements rising "more than fifteen-fold, from about 1,300 to approximately 20,000" between 2010 and 2018. *Id.* ¶ 65.

This explosion of contract pharmacies ballooned 340B's size and increased the risk of abuse. *Id.* ¶¶ 64, 67, 82-84. In a GAO study, contract pharmacies accounted for nearly two-thirds of the violations for unlawful diversion of 340B-priced drugs uncovered by HRSA. *Id.* ¶¶ 66, 82 ("The expansion of contract pharmacies . . . increases potential risks to the 340B Program, such as risks related to diversion and duplicate discounts."). The opportunity for abuse is even more acute given most contract pharmacies' use of the product "replenishment model." *Id.* ¶ 74 (alleging majority of Utah contract pharmacies operate using the product replenishment model). Although HRSA has directed that covered entities should retain title to 340B drugs and allow contract pharmacies to have 340B-priced drugs only if they operate as a covered entity agent, 61 Fed. Reg. at 43,550, 43,553, the product replenishment model jettisons these limitations, Compl. ¶ 71. Using this model, contract pharmacies dispense drugs from their general inventories to all customers (covered entity patient or not). *Id.* ¶ 67. On the back end, contract pharmacies use undisclosed algorithms to retroactively identify customers that may have some relationship to a covered entity.

---

[1] Both CVS and Walgreens have publicly disclosed that 340B profits are material to their finances and that a reduction in contract pharmacy arrangements "could materially and adversely affect" their finances. *Id.*

*Id.* ¶ 68. Contract pharmacies then restock their general inventories with 340B-priced drugs based on the algorithms' outcome. *Id.* ¶¶ 69-70.

Because drugs come out of a general inventory, the question is ***not whether*** the pharmacy will get the drug (delivery), it is only ***what price*** the pharmacy and covered entity will pay when the pharmacy replenishes its inventory. *Id.* ¶¶ 67-74; *Morrisey*, 760 F. Supp. 3d at 455.

The product replenishment model's black-box system—which does not require verification of covered-entity patient status at dispensing—creates more opportunities for illegal diversion. Compl. ¶ 68. It also results in greater profits for pharmacies and covered entities, creating an incentive to use more pharmacies and "catalog as many prescriptions as possible as eligible for the discount." *Novartis*, 102 F.4th at 457-58; Compl. ¶¶ 75-76. And because 340B pricing is not applied until after patients depart the pharmacy, most 340B price reductions are not shared with patients. *Novartis*, 102 F.4th at 457; *Morrisey*, 760 F. Supp. 3d at 447; Compl. ¶¶ 77-81. Given these developments, 340B has ballooned. Compl. ¶¶ 40-42. With the list price value (i.e., based on wholesale acquisition cost) of 340B purchases rising to $124.1 billion in 2023, 340B is now the second largest government pharmaceutical program, exceeded only by Medicare Part D. *Id.* ¶ 42.

3. <u>Manufacturers Attempt To Curb Abuse</u>

Faced with the increased risk of abuse, many manufacturers individually adopted policies on contract pharmacy use. *Id.* ¶ 87. The policies differ but each permits covered entities to purchase an unlimited number of 340B-priced drugs for delivery to the covered entity, while placing reasonable conditions when manufacturers will provide delivery of 340B-priced drugs to contract pharmacies. *Id.* ¶ 9; *Sanofi*, 58 F.4th at 701; *Novartis*, 102 F.4th at 458, 463-64.

In adjudicating the lawfulness of those policies, Compl. ¶¶ 89-99, the D.C. Circuit rejected the assertion that 340B requires manufacturers to provide 340B-priced drugs to an unlimited number of contract pharmacies. *Novartis*, 102 F.4th at 459-60. As the D.C. Circuit concluded,

Congress chose to impose only certain limited restrictions on 340B-participating manufacturers, including specifically that they make a "bona fide" offer. *Id.* at 460-64. This means that, under federal law, manufacturers retain the flexibility to impose "conditions on the distribution of covered drugs to covered entities," so long as those conditions are reasonable and consistent with the federal statute. *Id.* at 464. In short, the D.C. Circuit opinion defined the outer boundary of federal obligations to provide 340B-priced drugs to contract pharmacies. *Id.* at 459-64.

The Third Circuit similarly rejected an unlimited contract pharmacy requirement. *Sanofi*, 58 F.4th at 703-04 ("Nowhere does Section 340B mention contract pharmacies."). To the contrary, the court noted that "Congress's use of the singular 'covered entity' in the [statute's] 'purchased by' language suggests that it had in mind one-to-one transactions between a covered entity and a drug maker *without mixing in a plethora of pharmacies*." *Id.* at 704 (emphasis added); *id.* (340B does not "require[] delivery to an unlimited number of contract pharmacies"). It therefore enjoined the federal government from imposing this requirement. *Id.* at 706.

**B. Utah Senate Bill 69**

On March 27, 2025, Utah enacted S.B. 69. Compl. ¶ 105. S.B. 69's regulatory object is to change the terms of manufacturers' 340B participation by attempting to alter the terms of the federal bona fide "offer" manufacturers make. *See* Utah Code § 31A-46-102(1)-(2). S.B. 69 instructs that "[a] manufacturer may not directly or indirectly restrict or prohibit" (a) pharmacies and 340B entities from contracting, "including by denying [the pharmacy or 340B entity] access to a drug that is manufactured by the manufacturer"; (b) "the acquisition, dispensing, or delivery of a 340B drug to any location authorized by a 340B entity to receive the drug, unless prohibited by federal law"; or (c) "a 340B entity from receiving 340B drug discount program pricing for a 340B drug, including by imposing a time limitation on a 340B entity to replenish or submit a claim for a 340B drug." *Id.* § 31A-46-311(2)(a). It also provides that "[a] manufacturer may not directly

or indirectly require a 340B entity to" (a) "purchase a 340B drug from a supplier if the manufacturer would otherwise permit the 340B entity to purchase a drug that is not a 340B drug from the supplier" or (b) "submit any claim data, utilization data, or information about a 340B entity's contracts with a third-party as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity, unless the data or information sharing is required by federal law." *Id.* § 31A-46-311(2)(b). Finally, it specifies that "[a] manufacturer may not interfere with" (a) "a contract between a pharmacy and a 340B entity" or (b) "the ability of a pharmacy and a 340B entity to enter into a contract." *Id.* § 31A-46-311(2)(c). *S.B. 69 is clearly not about the delivery of drugs*: As specifically alleged, Utah pharmacies and covered entities may freely order any drug legally available to them for delivery at market pricing. Compl. ¶¶ 21, 127.

S.B. 69 subjects manufacturers to potential civil and criminal liability. *Id.* § 31A-46-401; *id.* § 31A-2-201(4); *id.* § 31A-2-308(9). Civil penalties include forfeiture of up to twice the amount of any profit and a penalty of up to $5,000 per violation. *Id.* § 31A-2-308(1)(a), (b)(ii).

### C. Procedural History

PhRMA filed suit on April 18, 2025, contending that S.B. 69 violates the United States Constitution's Supremacy Clause (Claim I), dormant Commerce Clause (Claim II), and Due Process Clause (Claim III). Compl. ¶¶ 1, 119-54. PhRMA filed for preliminary injunctive relief as to its preemption claim. ECF No. 17. The State filed an opposition to that request, ECF No. 29, and separately filed a motion to dismiss, ECF No. 28.

## ARGUMENT

When evaluating a motion to dismiss, the court must "accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Jordan-Arapahoe, LLP v. Bd. of Cty. Comm'rs*, 633 F.3d 1022, 1025 (10th Cir. 2011). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009). PhRMA easily clears this bar.

## I. PHRMA HAS SUFFICIENTLY PLED ITS PREEMPTION CLAIM

S.B. 69 is preempted by federal law. The Supremacy Clause provides that the "Constitution, and the Laws of the United States," are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Congress may impliedly preempt a state law under either field or conflict preemption principles. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 872-73 (2000). A state law is conflict preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000), or "interferes with the methods by which the federal statute was designed to" achieve those purposes and objectives, *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987) (state law preempted because it would "upset[] the balance of public and private interests so carefully addressed by the [federal statute]"). Similarly, a state law is field preempted where (1) Congress's "framework of regulation [is] 'so pervasive'" that Congress has "left no room for the States to supplement it," or (2) where there is a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Field preemption is especially likely where a state law "diminish[es] the [federal government]'s control over enforcement and detract[s] from the integrated scheme of regulation created by Congress." *Id.* at 402.[2]

### A. Claim I States A Preemption Claim

As PhRMA pled in its Complaint and explained in its motion for preliminary injunctive relief (at 12-20), S.B. 69 impermissibly attempts to rewrite both the substantive and enforcement

[2] "[T]he categories of preemption are not rigidly distinct." *Crosby*, 530 U.S. at 372 n.6.

terms of a federal program. *See* Compl. ¶¶ 119-36. Congress chose to utilize an offer-acceptance framework for 340B as the "method" to achieve its objectives. *Int'l Paper*, 479 U.S. at 494. Specifically, as the D.C. Circuit explained, Congress set the governing constraints on how manufacturers may operate vis-à-vis "offers" of 340B-priced drugs. *Novartis*, 102 F.4th 452, 462-64 (D.C. Cir. 2024). Each manufacturer's offer must be "bona fide." *Id.* at 464. But manufacturers retain flexibility to impose "conditions on the distribution of covered drugs to covered entities." *Id.* at 464. And as two federal appellate courts have addressed, these permissible conditions include a limitation on contract pharmacy use and claims data requirements. *Sanofi*, 58 F.4th at 7003-06; *see also Novartis*, 102 F.4th at 463-64. S.B. 69, however, specifically interferes with—indeed, attempts to override—Congress's chosen method for implementing 340B, by outlawing conditions in a federal program that Congress deemed permissible. *See* Compl. ¶¶ 119-36; PhRMA Prelim. Inj. Br. at 12-20; PhRMA Prelim. Inj. Reply at 3-11.

S.B. 69 also intrudes on and conflicts with Congress's chosen scheme of exclusive federal oversight. *See Astra*, 563 U.S. at 113, 120; *see also Buckman v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349-50 (2001). S.B. 69 provides another method through which 340B can be enforced. Utah thus renders non-exclusive the federal agency's authority to make discretionary judgments regarding enforcement, transfers to state courts the federal courts' authority to determine the limits of 340B's obligations, and ultimately compromises the federal government's ability to balance the interests of 340B, Medicare, and Medicaid. *See Astra*, 563 U.S. at 120. And it does so in precisely the way that *Astra* found problematic. *See id.* ("Recognizing the [] right to proceed in court could spawn a multitude of dispersed and uncoordinated lawsuits[.]"). Permitting state intervention in this process would destroy the federal government's unified control over 340B. That is precisely what the *Morrisey* court held, recognizing *Astra*'s "holding … controls." 760 F. Supp. 3d at 458.

As the *Morrisey* court further recognized, "[p]rice regulation is exclusively controlled by the federal statute, … state enforcement of it would necessarily intrude on the federal [340B] scheme." *Id.* That is reinforced by the federal government's own position: Federal ADR regulations issued in 2024 make clear HRSA's view that it has federal statutory authority to address the same issues as S.B. 69, including through ADR. *See* 89 Fed. Reg. at 28,643, 28,649 (Apr. 19, 2024) (defining overcharge claim, to be brought via ADR, to encompass "a claim that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price or the manufacturer does not offer the 340B ceiling price"). In other words, the federal government expresses that it has authority to address the same issue that S.B. 69 purports to regulate. *Id.*; 42 U.S.C. § 256b(d)(1). Utah's regulation of these same issues thus intrudes on the federal government's exclusive enforcement authority.

But the conflicts do not end there. State adjudication in this space also raises the threat of inconsistent adjudications that motivated *Astra*'s holding. *Astra*, 563 U.S. at 120; *Morrisey*, 760 F. Supp. 3d at 455-56 (finding similar state law governed pricing and "operate[d] as a means to enforce the 340B ceiling price"). Determining whether a manufacturer violated S.B. 69 requires determining if there was an underlying 340B obligation in the first place. To make the latter determination, a decisionmaker will need to answer several questions of federal law, including: (1) whether the drugs are actually covered outpatient drugs under 340B; (2) whether they are eligible for 340B pricing; (3) whether the manufacturer provided the 340B price; (4) whether there has been diversion or duplicate discounting (which includes determining whether a specific drug was distributed to a covered entity's "patient"); and (5) whether a covered entity is a 340B covered entity under federal law. *See Morrisey*, 760 F. Supp. 3d at 458.

This conflict strikes at the heart of the federal government's ability to uniformly apply and

enforce 340B nationwide. *Arizona*, 567 U.S. at 406-7; *see also Wis. Dep't of Indus., Lab. & Human Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986). And it ultimately compromises the federal government's ability to balance the interests of 340B, Medicare, and Medicaid, precisely in the way that *Astra* found problematic. 563 U.S. at 120 ("Recognizing the [] right to proceed in court could spawn a multitude of dispersed and uncoordinated lawsuits[.]"); *Morrisey*, 760 F. Supp. 3d at 456-58 (recognizing *Astra* controls).

Finally, S.B. 69 conflicts with 340B by unbalancing the federal enforcement regime. S.B. 69 gives state decisionmakers the right to impose a remedy, criminal penalties, "withheld from [a federal agency]." *San Diego Bldg. Trades Council, Millmen's Union v. Garmon*, 359 U.S. 236, 247 (1959). S.B. 69 also wholly ignores that Congress carefully calibrated HHS's power to levy civil monetary penalties, by requiring it to undertake several other steps first. 42 U.S.C. § 256b(d)(1)(B). S.B. 69 thus lacks the nuanced approach adopted by Congress to foster compliance through corrective measures rather than punitive actions. For those and other reasons, PhRMA has sufficiently pled a preemption claim.

**B. The State's Counterarguments Fail**

1. <u>There Is No Gap For Utah To Fill</u>

The State acknowledges (at MTD 12) that 340B creates an exclusively federal field: "Section 340B regulates the field of drug discount *pricing*." As discussed in PhRMA's preliminary injunction reply (at 3-8, 11), S.B. 69 regulates pricing, not delivery, so it is preempted. *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 636 (2013) (court must evaluate the state "statute's intended operation and effect").

The Complaint's allegations, which explain the product replenishment model used by contract pharmacies, underscore S.B. 69 regulates pricing. *Morrisey*, 760 F. Supp. 3d at 455-56 (explaining how the product replenishment model shows laws like S.B. 69 regulate price); Compl.

¶¶ 67-70, 73-74. Under the model, a pharmacy dispenses drugs from its general inventory to all customers. Compl. ¶ 67. After using algorithms to identify prescriptions that were allegedly 340B qualifying, the pharmacy, ostensibly on a covered entity's behalf, orders drugs at the 340B price to "replenish" its general inventory. *Id.* ¶¶ 68-70. The pharmacy already receives, orders, and stocks the very same drugs. The only question is what *price* the pharmacy will pay for the drugs, not whether they will be delivered. *Morrisey*, 760 F. Supp. 3d at 455; Compl. ¶¶ 67-70, 73-74, 77. Nor can there be any credible argument that barring the collection of claims data is about *delivery*.

But, even if the Court believes there is some ambiguity on that front notwithstanding the well-pled and detailed allegations that must be viewed in PhRMA's favor, S.B. 69 would still be preempted. Just because Congress did not use the words "contract pharmacy" or "delivery" does not mean there is a "gap" in 340B for Utah to fill. Instead, any purported silence on contract pharmacies reflects Congress's considered judgment on the method by which to implement 340B—an offer-and-acceptance regime that leaves to *manufacturers* the flexibility to impose reasonable conditions, so long as their offer to sell at the 340B price remains bona fide.

That considered judgment has preemptive effect. Take the Supreme Court's decision in *Arizona*. There, the federal Immigration Reform and Control Act of 1986 ("IRCA") criminalized employers' knowingly hiring or employing unauthorized workers but was "silent about whether additional penalties may be imposed" as to *employees*. Yet the Supreme Court nonetheless found an Arizona law imposing criminal penalties on the employee side of the equation preempted because it "upset[] the balance struck by" federal law and therefore stood as "an obstacle to the federal plan of regulation and control." *Id.* at 403. The Court understood Congress's "comprehensive" federal employment scheme as precluding state efforts to "enact[] a state

criminal prohibition where no federal counterpart exists." *Id.*[3]

*Arizona* governs here. 340B sets forth a "comprehensive framework," imposing reticulated requirements as to what manufacturers must do, the entities eligible for 340B pricing, and how HHS and HRSA should supervise compliance. *Id.* at 404. Just as Congress made a conscious decision in IRCA *not* to impose "criminal sanctions on the employee side," *id.*, the same goes for Congress's decision to omit explicit mention of contract pharmacies from 340B. While a separate part of the same bill provided for contract pharmacy arrangements, 38 U.S.C. § 8126, Congress chose not to include them in 340B, *Sanofi*, 58 F.4th at 704 (concluding that "Congress . . . knew how to impose delivery-related requirements" but "chose not to" and that "Congress's use of the singular 'covered entity' . . . suggests that it had in mind one-to-one transactions between a covered entity and a drug maker without mixing in a plethora of pharmacies"); *Novartis*, 102 F.4th at 460-63; *see also Polselli v. IRS*, 598 U.S. 432, 439 (2023). By requiring only that manufacturers "offer" drugs at the 340B price with reasonable conditions, Congress chose not to impose an unlimited contract pharmacy requirement and did not require manufacturers to assent to their use. Utah cannot impose an obligation Congress chose not to levy by redefining the required 340B offer.

The preemptive effect of Congress's judgment is particularly strong here, given that 340B is an incentive-based program and altering its terms will upset the balance struck by Congress.

[3] Courts have routinely applied these traditional preemption principles. In *Teltech Systems, Inc. v. Bryant*, 702 F.3d 232 (5th Cir. 2012), the Fifth Circuit addressed preemption in the context of restrictions on telemarketers. *Id.* at 233. Both the federal and state laws regulated "spoofing," where an individual "misrepresent[s] the originating telephone caller's identification." *Id.* at 234. While the federal law barred only spoofing with malicious intent, the state law also barred spoofing done without such intent. *Id.* Although the federal law did not address that issue, the Fifth Circuit nonetheless concluded the state statute was preempted. *Id.* at 238. The court observed that "Congress could have broadened [the federal statute's] proscriptive reach" "[b]ut it did not." *Id.* The federal law's "measured language . . . reflect[ed] . . . calibration." *Id.* Just as there was no gap for the state to fill in *Teltech*, there is no gap for Utah to fill here.

Consider *Forest Park II v. Hadley*, where the court addressed state authority in the context of a federal, incentive-based program. 336 F.3d 724, 731 (8th Cir. 2003) (recognizing "the unique federal laws and programs involved in th[e] case make it difficult to apply a traditional preemption analysis"). As the court held, while states may potentially institute their own incentive plans or programs, they cannot "place additional requirements on federal program participants[.]" *Id.* at 734. To hold otherwise would put at risk the goal of obtaining participation by private entities in the federal program. *Id.* at 733; *Mother Zion Tenant Ass'n v. Donovan*, 55 A.D.3d 333, 334 (N.Y. App. Div. 2008) (similar). That is true here. Again, 340B is a specific bargain struck by Congress with manufacturers—provide the 340B subsidy, and in return get access to reimbursement under other federal programs. Utah jeopardizes Congress's goal of maintaining participation by imposing additional obligations on manufacturers as part of 340B participation.

2. *McClain* Is Inapposite

Utah relies heavily on an out-of-circuit decision, *Pharmaceutical Research and Manufacturers of America v. McClain*, 95 F.4th 1136 (8th Cir.). With due respect to that court, its analysis is erroneous and, in any event, distinguishable. *Morrisey*, 760 F. Supp. 3d at 459. This Court should instead follow the far better reasoned decision in *Morrisey*.

*First*, the *McClain* court did not have the benefit of the D.C. Circuit's opinion in *Novartis* explaining in detail the contours of the 340B bona-fide offer framework, and thus did not consider PhRMA's arguments that S.B. 69 conflicts with 340B by reworking the terms of the federal offer.

*Second*, *McClain* was a summary judgment case that rested on two central erroneous factual assumptions, unlike *Morrisey*. In *McClain*, PhRMA argued that an Arkansas law was preempted because 340B was a closed system for providing a unique federal benefit, and that contract pharmacies were not part of that system. 95 F.4th at 1144. The *McClain* court rejected that argument because, in its view, "[c]overed entities purchase and maintain title to the 340B-

discounted drugs, while contract pharmacies dispense these drugs to covered entities' patients" and that contract pharmacies acted as the covered entities' agents. *Id.* at 1142, 1144. In other words, the *McClain* court viewed contract pharmacies as one-and-the-same as the covered entities. While those factual findings were unjustified based on the record, they have no bearing here at the motion-to-dismiss stage. PhRMA has specifically alleged, buttressed by public records, that contract pharmacies hold title to the drugs, *not* covered entities, and there is no indication principal-agent relationships exist between covered entities and contract pharmacies. Compl. ¶¶ 71-72. The *McClain* court's reliance on incorrect factual premises renders it inapposite.

*Third*, the *McClain* court relied *heavily* on an erroneous distinction between pricing and delivery that the State advances here, 95 F.4th at 1144-45, a distinction rightfully rejected by the *Morrisey* court. *Morrisey* explains that "[p]rice is what distinguishes between an 'ordinary drug' and a 340B Program drug." 760 F. Supp. 3d at 455. Indeed, Utah pharmacies can order and receive all of the same drugs at market prices. Compl. ¶¶ 20-21, ¶ 73 (pharmacies can "replenish their inventories by ordering the drugs at market prices, but they instead attempt to do so at 340B prices"). Thus, "the system is about delivery *at a given price*, not delivery *per se*." *Morrisey*, 760 F. Supp. 3d at 455. That is right: After all, there is no distinction between telling someone they must sell you a car for $1 versus telling someone they must deliver you a car priced at $1.

3. <u>S.B. 69 Does Not Benefit From A Presumption Against Preemption</u>

Utah incorrectly contends (at MTD 10-11) that S.B. 69 is entitled to a presumption against preemption because S.B. 69 regulates health and safety. But no presumption applies when a state law implicates an area of "unique federal concern." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507-08 (1988); *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1104-05 (10th Cir. 2015) (holding presumption did not apply in action involving federal employee health insurance plan because terms of a federal contract did not relate to a field states traditionally occupy); *US*

*Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1325 (10th Cir. 2010) (similar as to aviation safety).

S.B. 69 regulates a federal program and so does not benefit from a presumption. S.B. 69 is squarely and exclusively aimed at regulating federal 340B-priced drugs, as the State itself acknowledges (at MTD 16). *See* Utah Code § 31A-46-102(1) (explicitly targeting law only at 340B drugs, defined as "a drug purchased through the 340B drug discount program"); *see also id.* § 31A-46-311(2)(b) (explicitly prohibiting manufacturers from requiring claims data "as a condition" in their offer of *340B-priced drugs*). And 340B, at which S.B. 69 is exclusively aimed, is a federal regulatory program, created by federal statute and wholly administered by a federal agency through federal rules and federal contracts, PPAs. *See* 42 U.S.C. § 256b(a)(1); *Astra*, 563 U.S. at 119-20 (making clear the dominant federal interest in 340B). Because S.B. 69 acts directly and explicitly on 340B, it does not benefit from the presumption.

The State tries to escape that conclusion by labeling S.B. 69 a "health and safety" regulation. But courts look beyond the label a state attaches to its law when assessing whether a state law operates in an area of unique federal concern. *See United States v. Alabama*, 691 F.3d 1269, 1295-96 (11th Cir. 2012) (rejecting state's argument that its law was "shielded from preemption because it legislates in the field of contract law" and declining to apply presumption because state law was "a thinly veiled attempt to regulate immigration under the guise of contract law"); *see also Wos*, 568 U.S. at 639-40 (rejecting North Carolina's contention law fell "within the scope of a State's traditional authority to regulate tort actions" because statute "singles out Medicaid beneficiaries"). Because S.B. 69 is specifically targeted at 340B, it is not entitled to the presumption. And even if such presumption applied, it has been overcome. *Supra* at 9-16.

## II. PHRMA HAS SUFFICIENTLY PLED ITS COMMERCE CLAUSE CLAIM

PhRMA has sufficiently pled that S.B. 69 regulates extraterritorial conduct. "A basic principle of federalism is that each State may make its own reasoned judgment about what conduct

is permitted or proscribed within its borders." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003). This principle is embodied in the Commerce Clause, which prohibits states from "control[ling] commerce occurring wholly outside [its] boundaries," *National Pork Producers Council v. Ross*, 598 U.S. 356, 374, 376 n.1 (2023); *Ass'n for Accessible Meds. v. Ellison*, 2025 WL 1660112, at *3 (8th Cir. June 12, 2025) (holding that *Pork Producers* "did not overturn [Supreme Court's] cases that applied the dormant Commerce Clause to invalidate statutes that have the specific impermissible extraterritorial effect of controlling prices").

S.B. 69 violates these principles. S.B. 69 bans all pharmaceutical manufacturers, many of whom have no physical presence in Utah, from "directly or indirectly restrict[ing] or prohibit[ing]" certain behavior vis-à-vis pharmacies and 340B entities. Utah Code § 31A-46-311(a)-(b). The Utah Code does not impose a geographic limitation on its definition of "340B entity" or "pharmacy." *Id.*; *id.* § 58-17b-102(51). Thus, S.B. 69 applies to, for example, a non-resident manufacturer's sales to a non-resident wholesaler and the wholesaler's subsequent sale to a non-resident pharmacy. Compl. ¶ 143. Not only will it require manufacturers to provide the 340B price, it will also, given the offer-and-acceptance regime, force manufacturers to enter into many 340B transactions that they otherwise would not. *Id.*

By regulating commerce that occurs entirely outside of its borders, S.B. 69 violates the Constitution's bar on extraterritorial state regulation. *See Ellison*, 2025 WL 1660112, at *1-3 (striking down Minnesota law that barred manufacturers from "impos[ing], or caus[ing] to be imposed, an excessive price increase, whether directly or through a wholesale distributor, pharmacy, or similar intermediary, on the sale of any generic or off-patent drug sold, dispensed, or delivered to any consumer in the state"); *Styczinski v Arnold*, 46 F.4th 907 (8th Cir. 2022) (same as to Minnesota law that regulated transactions with a "consumer who lives in Minnesota" because

a trader could violate the law "without conducting a single transaction in Minnesota"); *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 666-71 (4th Cir. 2018) (invalidating Maryland drug-pricing law that "directly regulates the price of transactions that occur outside Maryland").

Utah contends (at MTD 21) there is no constitutional violation because "PhRMA does business in Utah." But, as PhRMA pled, manufacturers who are mostly located outside of Utah predominantly sell their drugs through non-resident distributors and wholesalers. Compl. ¶ 142. At this stage, PhRMA's allegations regarding S.B. 69's impact on non-resident manufacturers and on transactions between wholly out-of-state parties are sufficient. *See Pharm. Rsch. & Mfrs. of Am. v. Bailey*, 2025 WL 644281, at *6 (W.D. Mo. Feb. 27, 2025) (denying motion to dismiss).

## III. PHRMA HAS SUFFICIENTLY PLED ITS DUE PROCESS CLAIM

S.B. 69's prohibition on "interference" is unconstitutionally vague. The Fourteenth Amendment's Due Process Clause provides that no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Under the Due Process Clause, a statute is unconstitutionally vague if "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1233 (10th Cir. 2023). Where, as here, a statute imposes criminal in addition to civil penalties or implicates First Amendment freedoms, concerns about vagueness are at their zenith. *Vill. Of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498-99 (1982); *see also Winters v. New York*, 333 U.S. 507, 515 (1948); *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018); *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012) (stricter application of vagueness doctrine is appropriate where statute involves speech in order "to ensure that ambiguity does not chill protected speech"); *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

S.B. 69 broadly states that "[a] manufacturer may not interfere with" (a) "a contract

between a pharmacy and a 340B entity" or (b) "the ability of a pharmacy and a 340B entity to enter into a contract." Utah Code § 31A-46-311(c). S.B. 69 does not define the term "interfere." *Cf. Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 786 (4th Cir. 2023) (affirming district court grant of summary judgment to plaintiffs where law prohibited "interfer[ing] with or disturb[ing] in any way or in any place the students or teachers of any school or college in this State" and noting that "[i]t is hard to know where to begin with the vagueness problems with th[e] statute"); *United States v. Elliot*, 2018 WL 11478272, at *1, *3 (N.D. Ga. Aug. 8, 2018) (regulation that prohibited "[a]ny act or conduct by any person which interferes with, impedes or disrupts the use of the project" was unconstitutionally vague); *Corp. of Haverford Coll. v. Reeher*, 329 F. Supp. 1196, 1208-09 (E.D. Pa. 1971) *supplemented*, 333 F. Supp. 450 (E.D. Pa. 1971) (collecting cases).

The State asserts (at 22-23) that "common sense is all that is needed to understand 'interfere,'" citing the definition contained in Black's Law Dictionary. But inserting the State's offered definition of "interfere" does not cure the vagueness issue. S.B. 69 would be read to prohibit "[t]he act or process of obstructing normal operations or intervening or meddling in the affairs" of "a contract between a pharmacy and a 340B entity." *Id.* at 22; Utah Code § 31A-46-311(c). But that provides no actual guidance on what conduct is prohibited. And it is particularly problematic here given that S.B. 69 simultaneously *bars* manufacturers from requesting "information about a 340B entity's contracts with a third-party." Utah Code § 31A-46-311(b)(ii). S.B. 69 thus bars manufacturers from getting information about the existence or content of those contracts to even determine what they could potentially be "interfering" with. Tellingly, the State nowhere addresses this issue. PhRMA has sufficiently pled its Due Process claim.

## CONCLUSION

For the foregoing reasons, PhRMA respectfully requests that the State's motion to dismiss be denied. If the Court grants the State's motion, PhRMA respectfully requests leave to amend.

Dated: June 16, 2025

Respectfully submitted,

*/s/ Philip J. Perry*

Philip J. Perry (*pro hac vice*)
Andrew D. Prins (*pro hac vice*)
Abid R. Qureshi (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
philip.perry@lw.com

Peter C. Schofield
Allen M. Gardner
Christopher Sanders
Thanksgiving Park Four
2600 West Executive Parkway, Suite 400
Lehi, Utah 84043
(801) 426-2100
pschofield@kmclaw.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

On this 16th day of June, 2025, I hereby certify that I electronically filed the foregoing OPPOSITION TO DEFENDANTS' MOTION TO DISMISS with the Clerk of the Court using the CM/ECF system, which will send an electronic notification to counsel of record for all the parties.

*/s/ Philip J. Perry*
Philip J. Perry